David A. DUTTON, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: Jan. 11, 1982.
Decided: Sept. 10, 1982.

Edmund Hillis (argued), Nancy Jane Mullen and Eugene J. Maurer, Asst. Public Defenders, Wilmington, for defendant below, appellant.

Charles M. Oberly, III (argued), Deputy Atty. Gen., Wilmington, for plaintiff below, appellee.

Before HERRMANN, C.J., McNEILLY and QUILLEN, JJ.

QUILLEN, Justice:

On March 22, 1978, the defendant, David A. Dutton, was charged by indictment with Murder in the First Degree for intentionally causing the death of Susan Spahn, on or about November 6, 1976.[1] Defendant was initially tried before a jury in the Superior

---

1. The statute, 11 *Del.C.* § 636(a)(1), reads:

"(a) A person is guilty of murder in the first degree when:

(1) He intentionally causes the death of another person".

The indictment reads:

"MURDER IN THE FIRST DEGREE in violation of Title 11, Section 636(1) of the Delaware Code of 1974, as amended.

DAVID ALLEN DUTTON on or about the 6th day of November, 1976, in the County of New Castle, State of Delaware, did then and there intentionally cause the death of Susan E. Spahn."

Court in the fall of 1978. Due to the jury's inability to reach a verdict, however, a mistrial was declared. Defendant was subsequently retried before a jury in the Superior Court in early 1979. After several weeks of testimony, the jury convicted the defendant of the offense charged. From his conviction and subsequent sentencing to life imprisonment, the defendant appeals. We turn initially to the pertinent facts.

On Saturday, November 6, 1976, the victim, Susan Spahn, met her friend, Amy Barnes, at Miss Barnes' apartment. They went to a nightclub called "The Other Side" on Route 202 in New Castle County at approximately 11:30 p.m. Miss Barnes drove. The women, after entering the club, purchased drinks at the left-hand side bar and then found a table near the right-hand bar.[2]

After a few minutes, Miss Barnes noticed that an individual, later identified as the defendant, approached them and asked Miss Spahn to dance. Someone then asked Miss Barnes to dance. After a dance or two, the defendant accompanied Miss Spahn back to the table where the women had left their drinks. When Miss Barnes returned to the table, Miss Spahn introduced the defendant as "Dave".

At the table, Miss Barnes overheard a portion of the conversation between Miss Spahn and the defendant. In part, the defendant talked about the fact that he had shared an apartment with his sister and brother-in-law, but that they had moved out, taking their furniture along with them. Because of this, the defendant stated that he was looking for some new furniture. After a few minutes, Miss Spahn and the defendant went back onto the dance floor.

Soon thereafter, a man named Steve Molin approached Miss Barnes and asked her to dance. While dancing, Miss Barnes observed Miss Spahn and the defendant leave the dance floor and head back towards the table. Miss Barnes never saw her friend, Miss Spahn, again.

Up until 1:00 a.m., when the nightclub closed, Miss Barnes and Mr. Molin danced on the dance floor and talked at the table. Although, from time to time, Miss Barnes scanned the nightclub for Miss Spahn, it was not until closing that she actually began searching for her friend. With Mr. Molin's help, Miss Barnes searched the club, the nearby parking areas, and checked with the doormen on duty, but to no avail. Miss Barnes finally left and went home. The next morning, she checked the area hospitals for Miss Spahn with negative results. Finally, Miss Barnes called the police.

November 6, 1976 was the last day any of Miss Spahn's acquaintances saw her. Mariam Alverson, a friend of Miss Spahn, testified that Miss Spahn failed to meet her for church on Sunday, November 7th, as they had planned. Mrs. Margaret Spahn, the mother of Miss Spahn, testified that although they usually spoke by phone every day, she never heard from or saw her daughter after November 6th.

On November 11, 1976, Miss Barnes was asked to participate in the preparation of a composite drawing. The composite drawing, based upon the information supplied by Miss Barnes to the police artist, turned out to be an exceptionally accurate portrait of the defendant. On November 15th and 16th, the composite drawing was shown on local television. The police received two calls in response to the television broadcast naming the defendant as the person portrayed in the drawing.

On November 17, 1976, two Delaware State Police officers, Detectives Chapman and Thompson, interviewed the defendant at his place of employment because he had possibly been the last person to have seen Miss Spahn. Although at this point the State Police were treating Miss Spahn's disappearance as a missing person case, Detective Chapman advised the defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) prior to interviewing him.

---

2. After entering the club, patrons could go either to the left or right to separate bars. The two bars were separated by a dance floor.

Detective Chapman testified that the defendant seemed surprised at their presence, and at first denied knowing anything about the Other Side nightclub or Miss Spahn. When Detective Chapman informed the defendant that they knew he had been with Miss Spahn at the Other Side on the night in question, the defendant changed his story and admitted he had been there with her. The defendant then voluntarily consented to accompany them to Troop # 1 headquarters to give a more detailed statement as to the events of that night.

At Troop # 1, the defendant told Detective Chapman that he met Miss Spahn at the Other Side and danced with her. The defendant said they later went outside to his car to smoke some marijuana. At his car, however, Miss Spahn, declined to smoke marijuana; the defendant proceeded to do so. The defendant then stated that he and Miss Spahn went back into the nightclub after about twenty minutes, and he observed Miss Spahn reapproach the girlfriend with whom she had been earlier. This statement of the defendant was thus in direct conflict with that of Miss Barnes. The defendant stated that, once inside, he went to the left-hand side bar had a couple of drinks, danced with a girl with dark frizzy hair, and then left just before the nightclub's 1:00 a.m. closing. The defendant indicated that his roommate, one Marian Wagner, was asleep when he arrived home.

The November 17th interview at Troop # 1 lasted for approximately four hours, 2:00 p.m. to 6:00 p.m. The defendant allowed the police to take his photograph, and after receiving assurances from the police that he would not be prosecuted for any marijuana found in his car, allowed them to search it. According to Detective Chapman's testimony, during the search of the defendant's car, the defendant spontaneously made reference to a Florida case with which he was familiar and stated that "he could not be arrested unless there was a 'corpus delecti'". The questioning of the defendant on November 17th was thereafter terminated. Apparently, the police found nothing of value in pursuit of their investigation in the defendant's car.

The police continued their investigation by questioning the bartender, Wayne Clark, who serviced the left-hand side bar in the Other Side nightclub. Mr. Clark worked on November 6, 1976. At trial, Mr. Clark testified that he remembered seeing the defendant with a frizzy-haired girl, not after midnight, as the defendant had told the police, but earlier in the evening around 11:00 p.m. The bartender also testified that after midnight he did not see the defendant at the lower portion of the left-hand side bar. This conflicted with the defendant's statement to the police that he had acquired drinks at that spot. Between midnight and 1:00 a.m., when the nightclub closed, Mr. Clark said he never left the bar.

Additionally, the police contacted Marian Wagner, the defendant's roommate at the time. She testified that she had gone to bed at 2:00 a.m. on the night in question, and was awakened approximately one-half hour later because the defendant bumped into a wall.

The police rounded out their investigation by contacting the defendant's family members, friends and neighbors, who were very cooperative in providing the police with information. One of the defendant's sisters, Sheila Eaton, and her husband, Gordon, had shared an apartment with the defendant during the summer of 1976, several months prior to Miss Spahn's disappearance. Mrs. Eaton contacted the police on her own initiative on February 14, 1977 to report that on that day the defendant had told her "Everyone knows I did it, so what makes a difference."

It was not until fourteen months after the disappearance of Miss Spahn, however, that the police found the evidence that broke open the case against the defendant. On January 1, 1978, a human skull was found in a heavily wooded area located on the property of the Hercules Country Club. The skull proved to be that of Miss Spahn. An extensive search of the area was made by the police on January 5th and 6th. The police found: (1) other human skeletal re-

mains; (2) fragments of clothing and shoes; (3) jewelry; (4) several pieces of electrical wire and wire connectors; (5) some lengths of electrical wire attached to a stick; and (6) three broken pieces of handgrips from a revolver. The pieces of jewelry were identified by Miss Spahn's mother as belonging to her daughter. Miss Barnes identified that the fragments of clothing and shoes were from the items Miss Spahn had worn on the night of November 6, 1976, when she disappeared.

The police were able to connect the electrical wire, wire connectors and pistol handgrips to the defendant. Gordon Eaton, the defendant's brother-in-law, testified that, in the summer of 1976, he had given some wire connectors, similar to those found near Miss Spahn's remains, to the defendant. The wire was very common and easy to obtain. A neighbor of the defendant's during the fall of 1976, Russell Keblen, testified that he had observed some wire similar to the wire found with Miss Spahn's remains, in the defendant's car. As for the pistol handgrips, due to some fine police work, the police were able to link them with a burglary committed by the defendant during the summer of 1976. Several items, including a .22 revolver, which had similar handgrips to those found near Miss Spahn's body, a holster and some pieces of jewelry were taken. The defendant, at trial, admitted committing the burglary. Sheila and Gordon Eaton testified at trial that they were at the apartment when the defendant brought back the stolen goods. Mrs. Eaton and a friend, Marsha Mills, testified that the defendant had given them several pieces of the stolen jewelry. After Miss Spahn's disappearance, they turned the stolen goods over to the police. Other items from the burglary were recovered during a search of the defendant's residence. The true owners of the burglarized goods, Mr. and Mrs. George Hopkins, testified at trial. They identified several pieces of jewelry and other items. They also recognized the broken handgrips as similar to the handgrips which were on the revolver which was stolen.

Additionally, Gordon Eaton testified that on November 13, 1976, approximately one week after the disappearance of Miss Spahn, the defendant showed him a .22 revolver, minus handgrips and a broken hammer. Mr. Eaton indicated that there was a substance in the cracks of the gun which resembled blood. The defendant asked Mr. Eaton to get the gun fixed, but Mr. Eaton refused. When Mr. Eaton inquired as to whether there was blood on the gun, the defendant replied that there was, and that it had gotten on the gun when he hit a man in a fight at the Deer Park Tavern.

Sheila Eaton testified that her husband told her about the conversation he had had with the defendant concerning the revolver, and that she attempted to verify the defendant's story about the Deer Park Tavern fight by talking to people there, but could not find verification. Mrs. Eaton also testified that the defendant kept the revolver in question in a holster on his bedpost, at least up until September 1976 when the Eatons moved out of the apartment they shared with the defendant. Mrs. Eaton identified the broken handgrips, in evidence, at trial as similar to those on the gun the defendant had in the summer of 1976.

At trial, several experts were called by the State to testify about the cause of Miss Spahn's death. A Federal Bureau of Investigation specialist testified that both a knotted bra and a wire-and-stick device, found near the remains of Miss Spahn, had hair similar to that of Miss Spahn's entwined into them. The device, the specialist said, was known as a "Spanish windlass" and could have been used as a "ligature". He defined ligature "as being any type of loop formed by, in this case, wire or rope that is capable of being manipulated in such a manner as to decrease the diameter of the loop so as to increase the pressure on anything occupying the area of the loop." Two other experts, Dr. J. Lawrence Angel, a physical anthropologist employed by the Smithsonian Institution in Washington, D.C. and Dr. Ali Z. Hameli, the Chief Medical Examiner in Delaware, both testified that there were fractures to the mandible

(lower jaw) and to the sixth cervical (neck) vertebra. Dr. Angel testified that the fractures occurred at or about the time of Miss Spahn's death. Dr. Hameli testified that in his opinion Miss Spahn's death was not natural. Both testified that the blunt force which resulted in the neck and jaw fractures was the probable cause of Miss Spahn's death.

Defendant submits a number and variety of contentions on appeal in an effort to have the conviction reversed and the case remanded to the Superior Court for a new trial. These contentions will be addressed seriatim, as they were presented, in twenty-one separate arguments with Roman numeral identification.

### Argument I

On the late afternoon of the Friday immediately prior to the start of the defendant's second trial on Monday, January 22, 1979, defense counsel filed a "Motion to Dismiss Indictment". In the motion, the defense noted that subsequent to the discharge of the jurors who had sat during the defendant's first trial, several discharged jurors initiated conversations with the State's prosecutors. The motion also indicated that several discharged jurors initiated conversations with both defense counsel. Although the defense counsel state that their contacts with the discharged jurors were harmless, they attribute a breach of the Delaware Lawyer's Code of Professional Responsibility, specifically, DR7–108(D), to the State's prosecuting attorneys for their out-of-court contacts with discharged jurors.[3] Defense counsel argued that only the dismissal of the indictment could ameliorate the prejudice to the defendant which resulted from the out-of-court contacts between the State's attorneys and the discharged jurors. The alleged prejudice was that the State changed its trial strategy as a result of the contacts.

At a pre-trial conference on the first day of trial, attended by the defense counsel, the prosecutors and the Trial Judge, the defendant's motion to dismiss the indictment was discussed. The Trial Judge denied the defendant's motion because: (a) there had been a prior conference held where the question concerning the out-of-court juror contacts with both sides was discussed, and the defense counsel had raised no objections at that time; and (b) the defense counsel did not claim prejudice or attribute a change of trial strategy to the State's out-of-court contacts with discharged jurors, when the State had previously announced at another earlier pretrial conference that it would not call Richard Page. Page, a former inmate at the Delaware Correctional Center, had testified at the first trial that the defendant, while an inmate, confessed to Page that the defendant killed the victim. The prosecutor stated that the contacts with the discharged jurors were initiated by the jurors to express displeasure with the outcome of the first trial and had absolutely no connection with the decision not to call Page. The prosecutor further notes before us that at no time did the State seek out jurors to ask questions or make comments.

■ The defense's motion to dismiss the indictment amounted to an eleventh hour attempt to raise a pre-trial issue. There was no valid excuse for not raising the issue earlier and the Court was correct in being disturbed by the timing. Considering the context in which the defendant's motion was raised, the Trial Judge acted with proper discretion in denying it. Nor do we think the motion contained any factual foundation which would justify an evidentiary hearing on the allegation that the State determined not to use Mr. Page as a witness as a result of contacts with the discharged jurors from the first trial. Finally, we cannot conceive that such an ethical violation, if any, could possibly result in the dismissal of an indictment for murder in the first degree. No authority has been cited for such a draconian remedy. It strikes us as totally out of proportion with

3. DR7–108(D) reads:

"(D) After discharge of the jury from further consideration of a case with which the lawyer was connected, a lawyer shall not ask questions of or make comments to a member of that jury."

the alleged evil especially when the public interest is considered.[4]

## Argument II

■ Prior to the second trial, the Prothonotary, under the direction of the Trial Judge, stated in his address to the group of prospective jurors that "[t]his is not a death penalty case." The reason given by the Trial Judge for having the Prothonotary make this statement was that it would alleviate any misunderstanding the prospective jurors might have concerning the history and variety of recent murder statutes, and their constitutionality. The Court refused to advise the jury, however, that the penalty was in fact life imprisonment without benefit of probation or parole.[5] The defendant asserts that the Trial Judge committed prejudicial and reversible error by allowing the Prothonotary to make the statement in question because the jury, having been made aware of the absence of death as a possible punishment, might have allowed that knowledge to influence its verdict.

In some contexts, this Court has indeed taken the position that the jury should not be permitted to speculate as to postconviction consequences of a verdict. See, e.g.,

Smith v. State, Del.Supr., 317 A.2d 20, 25–26 (1974). Generally, it may well be better to confine the information going to the jury to matters which relate to issues they must decide. But we think it is somewhat artificial to say that it is reversible error to tell a jury that a particular first degree murder case is noncapital. That question automatically comes even to the mind of a layman and there has been so much publicity concerning it that it is helpful to clear the air.

Specifically, we note that the jury was necessarily informed that the defendant was charged with murder in the first degree, commonly viewed as the single most serious crime and one which often is related to the death penalty. Moreover, the Prothonotary's statement was made prior to the selection of a jury and before any consideration by the jury of the evidence, in order to dispel potential confusion. Juries facing a capital trial have understandable anxiety about conscientious scruples relating to capital punishment, individual juror *voir dire* on capital punishment, the length of time in jury selection, etc. There is a qualitative difference in a capital trial atmosphere that is at least to some extent generally known.

4. This case does demonstrate that members of the Trial Bar are uncertain as to ethical obligations with regard to post-jury discharge contacts with jurors. While we make no conclusion with respect to the ethical aspects of the allegations, we are transmitting a copy of this opinion to the Board on Professional Responsibility for such action as it may deem appropriate. If clarification of the standard is desirable, the Court of course would welcome a recommendation.

5. The precise exchange between trial defense counsel and the Trial Judge was:
"MR. MAURER: If we can put something on the record, your Honor. Your Honor, we had a conference this morning in which your Honor, I guess, ruled that you were going to tell the jury that this wasn't a death penalty case. I want to put something on the record about that at this time. We objected to any mention of the penalty involved in the case, based on what we feel to be the law in this State; that is, based on *Smith versus State* [Del.Supr., 317 A.2d 20 (1974)], *Garrett versus State* [Del.Supr., 320 A.2d 745 (1974)], and *Hand versus State* [Del. Supr., 354 A.2d 140 (1976)], where our Su-

preme Court, at least our interpretation of this rule, the jury is not to be concerned with the penalty involved when it tries a case and is to focus on the guilt or innocence. The Court decided to tell the jury that this was not a death penalty case and we wanted to put on the record our objection to that.
In addition, we ask that if the jury was going to be instructed as to the fact this was not a death penalty case, we requested in fairness they ought to be told what the penalty was, that is, life imprisonment without probation or parole, for murder first degree; and the Court declined to give that or to tell the jury that. We also object to that.
THE COURT: The basis for the Court's opinion was the variety of statutes that have been both enacted and declared unconstitutional throughout the last six or seven years; and with that kind of divergence and variety, it could very well lead to misunderstanding about the penalties involved. It was of sufficient import and of sufficient severity that I think it was necessary to resolve that question early on in the jury selection process."

With regard to prejudice, the advice appears to us to be clearly nonprejudicial. We find it difficult to believe that a jury would treat a first degree murder case with less diligence because the death penalty was not applicable. If anything, the absence of the availability of the death penalty might suggest to the layman that the alleged culpability of the defendant is less serious than normal. And the failure of the Trial Judge to say what sentence for first degree murder was available is consistent with the normal rule of law noted in the *Smith* case. Such an instruction would lead to complications such as a qualification as to the constitutional provision authorizing pardons or commutations of sentences. *Del. Const.,* art. VII. The jury has no role to play in the penalty of mandatory life imprisonment. The same has not been true historically and is not true presently with regard to capital punishment. *See* former 11 *Del.C.* § 3901 (Thompson and West, 1953) and current 11 *Del.C.* § 4209 (Michie, 1979). The advice was thus properly limited to the point of potential confusion.

Finally, we note the Trial Judge charged the jury after the State and defense rested to determine the defendant's guilt or innocence on the basis of the evidence and without consideration of what the consequences of such verdict might be. No error or prejudice has been shown.

We find the defendant's second argument to be without merit.

### Argument III

In this portion of the defendant's appeal, the defendant asserts three contentions in support of his argument that he was denied his Sixth Amendment right to a trial by a fair and impartial jury. We will deal with the defendant's contentions in the order of their presentation in the opening brief.

First, the defendant argues that the Trial Judge abused his discretion while conducting his *voir dire* examination of the group of prospective jurors assembled prior to the second trial when he did not ask the following questions included in the list proposed by the defendant:

"17. Would the nature of the offense charged against the defendant make it difficult for you to render a fair and impartial verdict?

18. Do you understand that the State in a criminal case is required to prove all elements of the offense charged beyond a reasonable doubt, before a defendant can be convicted of such offense?

19. Do you understand that a defendant in a criminal case has no duty or obligation under the law to prove or disprove any fact, but has an absolute right to remain silent?"

The defendant argues that the Trial Judge's failure to specifically ask the above-quoted proposed questions "deprived him of important information needed by him to 'exercise intelligently' his 'right to challenge prospective jurors, either peremptorily or for cause,' and rendered the *voir dire* examination of said jurors inadequate." We find the defendant's argument manifestly meritless.

◼ The purpose of a *voir dire* examination of prospective jurors is "to determine whether the prospective juror can render an impartial verdict upon the evidence and the law. Any questions which go beyond the ascertainment of this ultimate fact are entirely irrelevant to the *voir dire* examination and are properly struck by the trial judge." *Parson v. State,* Del.Supr., 275 A.2d 777, 783 (1971). We find nothing in the defendant's abstract questions # 18 or # 19, which would have helped the Trial Judge or defense counsel to intelligently determine whether a prospective juror was impartial, and thus it was a proper act of discretion on the part of the Trial Judge to refuse to ask them. *Wright v. State,* Del. Supr., 374 A.2d 824, 829 (1977); *Ward v. State,* Del.Supr., 366 A.2d 1194, 1197 (1976); *Jacobs v. State,* Del.Supr., 358 A.2d 725, 728 (1976). Defendant's argument concerning proposed question # 17 need not detain us, for we have reviewed the record and have found that the prospective jurors were specifically made aware of the nature of the offense charged against the defendant and were subsequently asked "[d]o you know of

any reason why you cannot sit as a fair and impartial juror in this case?" This was essentially the same question requested.

■ Second, the defendant argues that the Trial Judge improperly questioned individual prospective jurors in a leading manner, thereby inducing some of them to assert their impartiality, even when reluctant to do so. We have read the applicable portions of the record and find no merit in the defendant's argument. Demeanor plays a very important role in determining impartiality, and thus this determination is particularly within the province of the Trial Judge. *Ristaino v. Ross,* 424 U.S. 589, 594–95, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258, 263 (1976). Here, the experienced Trial Judge, in the presence of the individual prospective jurors, could best judge if any of the prospective jurors were reluctantly voicing their impartiality. Obviously questions must be pointed and direct in light of the subject matter and time considerations. But, from our appellate position, on the written record before us, we do not find evidence to support the defendant's argument that the Trial Judge induced reluctant jurors to assert impartiality.

■ Finally, in support of his constitutional contention of fair trial, the defendant argues that the Trial Judge abused his discretion by refusing to excuse for cause one particular prospective juror, who in the defendant's opinion was partial, thereby forcing the defendant to use one of his peremptory challenges to strike her. We have reviewed the record and conclude that there was no abuse of discretion on the part of the Trial Judge in refusing to excuse for cause the challenged prospective juror. Notwithstanding an impression of guilt created in the juror's mind by the media coverage of the case, the juror indicated she could be fair, objective and impartial and could decide the case on the basis of the evidence giving proper respect for the presumption of innocence. Under these circumstances, there was no abuse of discretion. *Irvin v. Dowd,* 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751, 756 (1961); *Parson v. State,* Del.Supr., 275 A.2d 777, 781–82 (1971). Compare 11 *Del.C.* § 3301.

In summary, the three arguments set forth by the defendant in support of his contention that he was denied his Sixth Amendment right to a trial by a fair and impartial jury are without merit.

### Argument IV

■ During the prosecution's direct examination of Detective Chapman concerning the early stages of the police investigation, the witness was asked:

"Q Did Mr. Dutton, to the best of your knowledge, ever contact you or the Delaware State Police and indicate that he in fact was the person that was depicted in the composite?

A No, he did not."

Defense counsel immediately asked to approach the bench and moved for a mistrial claiming that the question and answer were a comment on the defendant's right to remain silent. The Trial Judge denied the motion. Here, on appeal, the defendant challenges that ruling arguing that it was reversible error for the prosecution to have elicited the aforementioned testimony because it impinged upon the defendant's right to remain silent and created an inference of guilt.

We fail to see the merit in defendant's position. The question and answer strike us as innocuous. There was no foundation as to the defendant's knowledge and this was readily apparent to the jury. Moreover, even if the remark be considered a comment on defendant's right, "[n]ot every reference to the exercise of the right to remain silent mandates reversal." *Tyre v. State,* Del.Supr., 412 A.2d 326, 329 (1980); *Cook v. State,* Del.Supr., 374 A.2d 264, 269–70 (1977). See also *Styler v. State,* Del.Supr., 417 A.2d 948, 950 (1980); *Shantz v. State,* Del.Supr., 344 A.2d 245, 246–47 (1975). Finally, the defendant in this case testified and said he looked at the composite in the newspaper for the first time after he was interviewed by the police. The isolated question and answer simply had no significance when the trial is examined as a whole.

## Argument V

The defendant makes another argument concerning the prosecution's questioning of Detective Chapman. Defendant argues that the Trial Judge abused his discretion in allowing Detective Chapman on redirect examination to testify about defendant's out-of-the-blue statement concerning the need for the police to have a "corpus delecti" before they could arrest him. In addition, the defendant contends that the Trial Judge erred in allowing the State to call Jack Phillips, a practicing criminal defense attorney, as an expert to define for the jury the meaning of "corpus delecti".

First, as to defendant's completely voluntary and spontaneous utterance, we cannot agree with defendant's argument that the testimony was not relevant. Delaware Uniform Rules of Evidence, Rule 401 (Michie Cum.Supp.1980) says relevant evidence has a "tendency to make the existence of any fact that is of consequence . . . more probable or less probable . . . ." Surely, the proferred testimony was highly relevant to the defendant's state of mind. 29 Am.Jur.2d, *Evidence* § 355 (1967). See, *Goldsmith v. State,* Del.Supr., 405 A.2d 109, 114 (1979); *Parson v. State,* Del.Supr., 275 A.2d 777, 788–89 (1971); *Zutz v. State,* Del. Supr., 160 A.2d 727, 730 (1960). The statement attributed to the defendant was one link in the chain of evidence during the early stage of the police investigation which led the police to suspect that defendant might have had something to do with Miss Spahn's disappearance. It was proper for the Trial Judge, for the benefit of the jury, to allow the State to take a step-by-step approach in showing how the police developed and ultimately concluded their case against the defendant. The comment is one which would strike a reasonable observer as important.

Second, while it is true that the testimony of Jack Phillips, who gave a legal definition of the term "corpus delecti", may not have been probative of the defendant's use and understanding of that term, we do not feel it was error for the Trial Judge to have allowed the jury to be given the denotative meaning of the term. No harm can be attributed to the expanding of a juror's vocabulary. Having the legal definition of the term, the jury could better judge the use of the term made in the testimony.

## Argument VI

Defendant contends that the Trial Judge committed reversible error when he, over defendant's objection, allowed the State to submit into evidence the deceased's fractured vertebrae and mandible in conjunction with the testimony of Dr. J. Lawrence Angel, Curator of Physical Anthropology at the Smithsonian Institution, and Dr. Ali Z. Hameli, Medical Examiner of the State of Delaware. The doctors' testimony concerned the cause of Miss Spahn's death. Defendant argues that the Trial Judge abused his discretion in allowing admittance of the bone fragments because they lacked probative value, were inflammatory and prejudicial, and constituted nothing more than cumulative evidence.

The introduction of the bone fragments in conjunction with both doctors' testimony was probative as to Miss Spahn's cause of death. The State was entitled to show the fractures directly from the fragments. Even though the State introduced photographs of these bone fragments we find no abuse on the part of the Trial Judge in admitting the bone fragments themselves. *Casalvera v. State,* Del.Supr., 410 A.2d 1369, 1372–73 (1980); *Longoria v. State,* Del.Supr., 168 A.2d 695, 703 (1961), cert. denied 368 U.S. 10, 82 S.Ct. 18, 7 L.Ed.2d 18 (1961); *Rasnick v. State,* Md. App., 7 Md.App. 564, 256 A.2d 543, 546 (1969), cert. denied 400 U.S. 835, 91 S.Ct. 70, 27 L.Ed.2d 67 (1970). As a general rule it can be said that bones, photographs and other exhibits with probative value, even though shocking and gruesome, are admissible. 29 Am.Jur.2d, *Evidence* § 260; 23 C.J.S. *Criminal Law* § 852(1); *Casalvera,* 410 A.2d at 1372–73 and cases cited therein; *State v. Hill,* Kan.Supr., 193 Kan. 512, 394 P.2d 106, 108 (1964); *State v. Spencer,* Kan. Supr., 186 Kan. 298, 349 P.2d 920, 924

(1960); *State v. King,* Kan.Supr., 111 Kan. 140, 206 P. 883, 888 (1922). *Wisniewski v. State,* Del.Supr., 138 A.2d 333, 337 (1957); *Bantum v. State,* Del.Supr., 85 A.2d 741, 746 (1952). *But see Commonwealth v. Chacko,* Pa.Supr., 480 Pa. 504, 391 A.2d 999, 1000 (1978). However, in this case, the bones of the deceased introduced into evidence did not have a shocking or gruesome appearance. "The exhibit was prepared in such a way as to be no different from hundreds of exhibits from antiquity or from science to be found in museums. Viewed by itself, it barely connotes the violent death of the victim." *People v. Barbat,* Mich.App., 49 Mich.App. 519, 212 N.W.2d 318, 323 (1973). *See People v. Kozlow,* Mich.App., 38 Mich. App. 517, 196 N.W.2d 792, 795 (1972); *State v. Turner,* Kan.Supr., 193 Kan. 189, 392 P.2d 863, 872 (1964). We find no error on the part of the Trial Judge in admitting this evidence.

## Argument VII

In this segment of his appeal, the defendant contends that Dr. Lawrence Angel was unqualified to express an opinion as to the cause of Miss Spahn's death. Defendant argues that the Trial Judge clearly abused his discretion in admitting such testimony over defendant's objection.

To focus upon defendant's contention, we summarize Dr. Angel's qualifications. Dr. Angel is a physical anthropologist. Physical anthropology is the study of the physical or biological aspects of man. Dr. Angel acquired a Ph.D. in physical anthropology at Harvard University. He taught anatomy at Jefferson Medical College in Philadelphia, Pennsylvania for nineteen years, and since 1972 has been affiliated with the Smithsonian Institution, Washington, D.C., as Curator of Physical Anthropology. In conjunction with his work for the Smithsonian Institution he teaches an introductory course of physical anthropology at George Washington University. Dr. Angel is also very active with forensic study organizations. Prior to his participation in defendant's trial, Dr. Angel had participated in ten or eleven criminal cases. His testimony

in those cases concerned his study of skeletal remains found at the scene of a crime or in relationship to a crime.

With regard to this case, the defendant acknowledges that Dr. Angel is unquestionably qualified "to testify to his observations of any damage to the remains of Miss Spahn, and the time and manner of their occurrence." However, defendant feels that "Dr. Angel went far beyond the limits of his expertise in expressing his opinion as to the cause of Miss Spahn's death." We cannot agree with defendant's position. Considering the fact that the only evidence shedding any light on the physiological cause of Miss Spahn's death was the condition of her skeletal remains, we fail to see how Dr. Angel, after examining the bones, was unqualified to express an experienced opinion on the cause of Miss Spahn's death.

The basis of Dr. Angel's opinion concerning Miss Spahn's death is succinctly set forth in the following passage taken from defense counsel's cross-examination of Dr. Angel:

"BY MISS MULLEN:

Q Doctor Angel, you testified before we recessed this afternoon that you felt that death might have been caused in this case due to a compression of the neck resulting in, perhaps, a loss of air or blood supply to the brain; is that correct?

A That's correct.

Q Now, my question is, with respect to that opinion, upon what do you base it? Why do you feel that it is speculative in nature to some extent?

A I base it on my knowledge of anatomy, of the structures of the neck which overlie the injured vertebra all across the neck. And it is speculative to the extent that I don't know from personal experience or direct observation what the exact type of ligature used was or the length of time that it was applied. It has to be a possibility, not a fact. But it's a common sense inference and not necessarily a medical inference.

Q So are you saying that the fracture to the vertebra might be evidence of or consistent with strangulation, but it does

not, itself, establish strangulation occurred; is that right?

A Yes, I think that's correct.

. . . . .

BY MISS MULLEN:

Q Are your conclusions based on what you feel is a reasonable scientific certainty, Doctor Angel?

A Yes, they are."

We find without question that Dr. Angel had "the requisite background of knowledge and experience upon which to [base] his conclusion." *Peters v. Gelb*, Del.Super., 303 A.2d 685, 688 (1973), affirmed, Del. Supr., 314 A.2d 901 (1973). In essence, he related the skeletal remains to the other evidence and said they were consistent with strangulation. There was no abuse of discretion on the part of the Trial Judge in admitting Dr. Angel's testimony.

### Argument VIII

Defendant contends that his conviction requires reversal because the Trial Judge violated his Sixth and Fourteenth Amendment rights to effective assistance of counsel and to a fair trial. The basis for this charge is defendant's claim that the Trial Judge (a) interrupted defense counsel too frequently while she was cross-examining Dr. Angel, (b) indicated in front of the jury that defense counsel did not know how to properly question the witness, and (c) commented in front of the jury, "Oh, is something amusing, Miss Mullen?"

To put defendant's constitutional violation contention in perspective, we note a comment in the State's brief: "[t]he trial of this case took approximately one full month; the transcript is in excess of 2,500 pages. From this record, Appellant has culled and focused upon one minor exchange with the Trial Judge that he claims was so prejudicial that a mistrial should have been called. The record does not support this request." We agree.

First, defendant's argument that the Trial Judge frequently interrupted defense counsel's cross-examination of Dr. Angel is meritless. We have reviewed the record and have found that the Trial Judge interceded to a significant extent only twice. This finding hardly supports defendant's position. From our reading of the record it appears that in both instances the Trial Judge, on his own initiative, sought to clarify the line of questioning of defense counsel. The Trial Judge attempted to insure that defense counsel did not cross-examine Dr. Angel as to testimony the Trial Judge had stricken from the record. We find nothing improper in this instance of the Trial Judge carrying out his "responsibility of managing the conduct" of the trial. *Williams v. United States*, D.C.App., 228 A.2d 846, 848 (1967).

Second, defendant contends that the Trial Judge improperly commented upon defense counsel's ability to cross-examine Dr. Angel. This contention concerns a colloquy between the Trial Judge and defense counsel, which in transcribed form amounted to two and one-half pages. The pertinent part of the discussion revolved around whether defense counsel laid the proper foundation in the attempt to impeach Dr. Angel with supposedly prior inconsistent statements. This type of interaction is common during trials and we can find no comments made by the Trial Judge which could be characterized as "prejudicial". Thus, we find no basis for reversal under this contention.

And finally, as to the comment of the Trial Judge to defense counsel, there was a chambers conference between the Trial Judge and counsel during the recess following the testimony of Dr. Angel. It seems clear that defense counsel had demonstrated her frustration by some facial expressions while the Trial Judge was ruling on a State objection. It was described by the Trial Judge as a "smirk" and was acknowledged in less aggravating terms by counsel. From our appellate perch, it appears the incident was blown somewhat out of proportion. In any event, the Trial Judge's remark, "Oh, is something amusing, Miss Mullen?" is understandable given the context. Mutual respect must exist between Judge and counsel. *State v. Hedding*, Vt.Supr., 122 Vt. 379, 172 A.2d 599,

602 (1961). No error will be attributed to a Trial Judge's controlled response to what he views as a breach of required professional etiquette. Here, the Trial Judge acted with some patience and saved his most pointed remarks to defense counsel for chambers and out of the hearing of the jury. *See Wright v. State,* Del.Supr., 405 A.2d 685, 689 (1979); *Delaware Judge's Code of Judicial Conduct,* Canon 3 A(3). There was no error.

In sum, we find that defendant's contentions claiming denial of effective assistance of counsel and a fair trial must fail.

### Argument IX

Based upon his study of Miss Spahn's skeletal remains found at the crime scene, Dr. Ali Z. Hameli, Delaware's Chief Medical Examiner, testified with respect to Miss Spahn's cause of death. Prior to allowing such testimony to be given before the jury, the Trial Judge held a *voir dire* examination. Upon hearing the testimony given during the *voir dire* examination, and the arguments made by both sides, the Trial Judge made the following determination:

"With regard to the use of the words 'degree of medical probability,' the Court rules now that that standard is sufficient under the circumstances to—in this criminal case. And that portion of the Doctor's opinion that has to go—that does go towards death occurring by reason of blunt-force injury to the jaw and to the sixth cervical vertebra will be allowed."

Defendant argues that the Trial Judge erred in allowing Dr. Hameli to testify about the probable cause of Miss Spahn's death because the doctor was unable to base his conclusions on a "reasonable degree of medical certainty."

■■■ The Trial Judge did not err in admitting Dr. Hameli's testimony. In homicide cases where the cause of death is not susceptible of explanation based upon common observation or experience, qualified medical experts after proper and sufficient examination of the body or remains of the deceased may give opinion testimony based upon such examination "as to the probable cause of death, provided there are

sufficient facts in evidence upon which to base the conclusion", 40 Am.Jur.2d, *Homicide* § 398 at 655 (1968). *See also Air Mod Corporation v. Newton,* Del.Supr., 215 A.2d 434, 438 (1965); *Riegel v. Aastad,* Del.Supr., 272 A.2d 715, 718 (1970); *General Motors Corporation v. Freeman,* Del.Supr., 164 A.2d 686, 688–89 (1960). The Trial Judge properly admitted Dr. Hameli's testimony concerning Miss Spahn's cause of death as the doctor avoided speculation and based his opinion upon the injuries apparent on the skeletal remains of Miss Spahn.

### Argument X

■■■ Shortly after the disappearance of Miss Spahn, defendant had several conversations with his sister, Patrice Voight, concerning several aspects of this case. The State called Mrs. Voight, a somewhat involuntary witness. During her cross-examination, Mrs. Voight testified that the defendant steadfastly denied having had anything to do with the disappearance of Miss Spahn. And on redirect examination she testified that she believed basically everything the defendant had told her. In an attempt to impeach Mrs. Voight, the State asked the following questions, over a defense objection:

"BY MR. OBERLY:

Q Patty, on February 3rd, 1977, didn't you tell Detective Chapman that you did not believe that David was telling you everything he knew? Do you recall telling Detective Chapman that?

A Not really, but I possibly could have.

Q Was your brother being evasive in answering your questions?

A No. But I really didn't ask him a whole lot of questions.

Q Why would you have said that?

MR. MAURER: Your Honor, she testified she doesn't remember saying that.

THE COURT: That's right.

MR. OBERLY: No further questions.

THE COURT: Anything on recross?

MR. MAURER: That's all, your Honor.

THE COURT: You may step down." Seeking to rebut Mrs. Voight's noncommittal answer, the State called Detective Chapman to testify about his February 3, 1977 interview with Mrs. Voight. The detective read from his notes an answer made by Mrs. Voight to one of his questions: "Does feel that Dave is not telling all that he knows." Detective Chapman was soon thereafter excused.

Defendant contends that the Trial Judge committed reversible error as a matter of law in allowing the admittance of Mrs. Voight's prior out-of-court statement. The rationale for this contention is that the jury is the sole fact-finder as to the defendant's credibility. Thus, the defendant argues it was improper for Detective Chapman to testify as it "clearly constituted Ms. Voight's opinion that the defendant was lying to her, or at least not being entirely truthful with her, in their discussions about Ms. Spahn's disappearance, and this was a comment on [defendant's] credibility." But this characterization of the above-quoted testimony is erroneous. The quoted portion of the State's examination of Mrs. Voight and the subsequent questioning of Detective Chapman was undertaken to impeach Mrs. Voight. It did not impinge upon the jury's role of weighing the defendant's credibility. The jury, as is customary, was specifically charged that it was the sole judge of the credibility of the witnesses.

Defendant cites several cases in support of his position but we find them directed to a different issue. Those cases ostensibly stand for the proposition that "[w]hether a witness on the stand personally believes or disbelieves testimony of a previous witness is irrelevant, and questions to that effect are improper, either on direct or cross-examination." *Mutyambizi v. State,* Md.Sp. App., 33 Md.App. 55, 363 A.2d 511, 516 (1976). *See also Commonwealth v. Grant,* Pa.Supr., 479 Pa. 74, 387 A.2d 841, 843–45 (1978). The testimony we have examined here, however, was not introduced to support or disparage the defendant's later introduced testimony. It was admitted with the view towards impeaching Mrs. Voight's statement at trial that she believed the defendant told her the truth when he said he had nothing to do with Miss Spahn's disappearance. Admittedly, the State position has a bootstrap element to it since it was the State, and not the defendant, that asked Mrs. Voight if she believed the defendant, a solicitation of a lay opinion. But the State was attempting to elicit testimony from an essentially hostile witness. Under these circumstances, the Trial Judge did not abuse his discretion in admitting the above-mentioned testimony for the impeachment purpose noted.

### Argument XI

■ During the direct examination of Sheila Eaton, defendant's sister, Mrs. Eaton testified that on February 14, 1977 she had a telephone conversation with the defendant about this case. In response to her question of whether he had killed anybody, he told her that "I killed once and I can do it again." Defense counsel immediately objected, arguing that the statement was ambiguous and presented a possibility that the jury could interpret it as a reference to a crime other than the one being tried. The Trial Judge agreed and instructed the jury to "completely put it out of [their] minds, not infer anything from it, and not rely on it in any way in [their] deliberations."

In this appeal, defendant argues that the instruction was insufficient to wipe away the alleged prejudice and that a mistrial should have been granted. We cannot agree. Having examined the transcript, we find that the Trial Judge, being in the same position as the jury with regard to viewing demeanor and hearing the statement, took immediate steps to consider and correct any prejudice which could be attributed to it. The vague possibility that the jury took the utterance to mean that defendant committed some other murder was sufficiently cured by the Trial Judge's cautionary instruction. We find no abuse of discretion on the part of the Trial Judge for denying defendant's motion for a mistrial. *Compare Shields v. State,* Del.Supr., 374 A.2d 816,

821 (1977), cert. denied, 434 U.S. 893, 98 S.Ct. 271, 54 L.Ed.2d 180 (1977); *Johnson v. State,* Del.Supr., 311 A.2d 873, 874 (1973). If anything, the Trial Judge erred on the side of caution.

### Argument XII

■ Pieces of two gun grips, similar to those· on a gun the defendant possessed prior to Miss Spahn's murder, were found near the victim's body. In the same month as the victim's disappearance, the defendant asked his brother-in-law, Gordon Eaton, to fix his gun, which was missing several parts, including its gun grips. There also, according to Mr. Eaton, appeared to be dried blood in the cracks of the gun. When asked how the gun got in such a condition, the defendant told his brother-in-law that the gun was broken during a fight at the Deer Park Tavern in Newark. According to defendant, a patron of the tavern hit him over the head with a beer bottle during an argument over a woman. The fight then moved outside where the defendant hit the patron in the head with the gun, leaving him unconscious on the ground. Upon hearing this story, the defendant's brother-in-law refused to fix the gun. The defendant later related the same story to his sister, Sheila Eaton. The defendant said, according to Mrs. Eaton, that he "did not know if [his adversary] was dead or alive."

Realizing that the police had interviewed the defendant on November 17, 1978, approximately two weeks after the disappearance of Miss Spahn, Mrs. Eaton, along with her father, attempted to verify the defendant's story by going to the Deer Park Tavern. During her direct examination at trial, Mrs. Eaton testified about the result of this pursuit:

"Q Did you ever personally try to verify or determine whether or not there had been such a fight at the Deer Park?

A Yes.

Q Did you of your own knowledge find anything about such a fight?

A No."

Defense counsel immediately objected to this testimony, arguing that Mrs. Eaton's testimony was hearsay. The objection was overruled.

In his appeal, defendant contends that the Trial Judge committed reversible error in failing to strike this testimony from the consideration of the jury. The aforementioned testimony has hearsay elements, as the testimony concerning the inquiry can be viewed as "an indirect way of placing in evidence the statements of those of whom inquiry was made for the purpose of proving the truth of the fact stated." McCormick, *McCormick on Evidence* § 249, at 594 (2d ed. 1978); *Delaware Uniform Rules of Evidence,* Rule 801(c) (Michie Cum.Supp. 1980).· However, the majority of cases having dealt with negative results from inquiries appear to allow such evidence on the theory that "fruitless inquiries are evidence of inability of the inquirer to find after diligent search and this in turn is circumstantial evidence of the nonexistence of the [fact] in question." *McCormick on Evidence, supra,* at 594; *State v. Kern,* Iowa Supr., 307 N.W.2d 22, 26 (1981); *State v. DePietro,* La.Supr., 243 La. 897, 148 So.2d 593, 594 (1963). In this case, Mrs. Eaton described her inquiries and was available for cross-examination. Her negative results were also supported by evidence that there had been no police reports or medical reports to the appropriate authorities about the alleged incident. In light of these safeguards, we find no error in the Trial Judge having admitted the aforementioned testimony under the facts of this case.

### Argument XIII

■ Evidence was introduced at trial that defendant purchased a used Pontiac Grand Prix on November 5, 1976, the day before Miss Spahn disappeared. The State called Russell Keblen, a neighbor of the defendant during this period of time, who testified that sometime between November 6, 1976 and the date of the first broadcast of the defendant's composite on television, November 15, 1976, the Grand Prix was missing for two or three days and when it returned it was clean inside and out and waxed. In addition, Mr. Keblen testified that, prior to November 15, 1976, the defendant attempted to sell the car to him.

During the State's direct examination of Mr. Keblen, he testified that his wife, Cheryl, upon seeing the defendant's composite picture, called the police and gave them defendant's name. Mr. Keblen also recalled seeing wire, allegedly similar to that found near Miss Spahn's remains, in the car defendant owned prior to purchasing the Grand Prix. During cross-examination, it was brought out by defense counsel that it was not until two weeks prior to defendant's second trial that Mr. Keblen related the above information to the police, approximately two years after the events involved.

On redirect examination, Mr. Keblen testified that at first he did not want his wife to contact the police after recognizing the defendant as the person portrayed in the composite broadcast on television "because [he] was scared of her safety and [his] children". Mr. Keblen subsequently cited this generalized fear as the reason for not talking to the police until two weeks prior to trial. Defense counsel objected to Mr. Keblen's testimony concerning his fear for the safety of his family and moved for a mistrial. The motion was denied, but the Trial Judge did give the jury the following instruction:

> "THE COURT: Ladies and gentlemen, this witness has testified as to his fears for the safety of himself and his family concerning testimony he has given. You're instructed that there's no evidence whatsoever that any threats have been made to this witness or this witness' family by David Dutton or any individual acting on David Dutton's behalf. The witness' concern reflects only a generalized concern based on the fact that this is a criminal case."

In this appeal, defendant contends that Mr. Keblen's testimony was so prejudicial that the Trial Judge's cautionary instruction was inadequate and the failure to grant a mistrial constitutes an abuse of discretion requiring reversal. We fail to discern any merit in the defendant's argument. It was legitimate for the witness to have an opportunity to offer an explanation for the delay in the reporting of the infor-

mation. Compare, *Commonwealth v. Smith,* Pa.Supr., 487 Pa. 626, 410 A.2d 787, 791 (1980); *State v. Mulero,* N.J.Supr., 51 N.J. 224, 238 A.2d 682, 684 (1968).

## Argument XIV

▉ Two weeks into the trial, a juror sent a note to the Trial Judge indicating, without elaboration, that one of the jurors might be prejudiced. In response to this information the Trial Judge had a prolonged meeting with counsel. At this meeting, it was agreed that an interview with the note-writing juror (juror # 11) was necessary. The interview disclosed juror # 11 thought that juror # 9 might be prejudiced against the defendant because juror # 9, during a lunch break, expressed a fear that defendant might have access to the jurors' names and addresses. After this interview, defense counsel sought a mistrial, which was denied. The Trial Judge then interviewed juror # 9, in the presence of counsel, and it was determined to everyone's satisfaction that juror # 9 was not prejudiced and would keep an open mind until all the evidence was heard. However, after further inquiry of juror # 11, it was found that, although he had an open mind as to the evidence at trial, there was a little trepidation on his part that he would not be viewed favorably by the other jurors for voicing his concern to the Trial Judge. This fear was soon allayed after further discussion with the Trial Judge. At the conclusion of this extensive episode, the Trial Judge, in part on the recommendation of defense counsel, decided that it was nonprejudicial to keep both jurors # 9 and # 11 on the jury. In addition, the Trial Judge gave a cautionary instruction to the full jury that they must maintain an open mind about the case until all of the evidence was introduced.

On appeal, defendant contends that the Trial Judge abused his discretion in not granting a mistrial based upon the situation described above. Although defense counsel failed to request that both jurors # 9 and # 11 be disqualified and replaced by alternates, after the extensive and thorough examination of them both, defendant in this

appeal argues that based upon the facts outlined above juror # 9 should have been "*prima facie*" disqualified and intimates the same with regard to juror # 11. We have examined the record pertinent to this segment of the trial and find no abuse of discretion in the way the Trial Judge handled this matter. It is quite evident that the Trial Judge was sensitive to the defendant's right to a fair trial and sought, with the help of counsel, to insure that the jurors, individually and collectively, remained nonbiased, nonprejudiced and open-minded throughout the trial. Thus, we find no merit to the defendant's contention. Compare *White v. State,* Del.Supr., 404 A.2d 137, 139–40 (1979).

## Argument XV

 In this portion of his appeal, defendant contends that it was reversible error for the Trial Judge to have allowed the introduction of evidence concerning a July 13, 1976 burglary, which defendant at trial subsequently admitted committing. The burglary provided one link in a chain of evidence connecting defendant with the pieces of gun grips found near the remains of Miss Spahn. The victims of the burglary testified that a Colt Frontier Scout revolver, among other items, was stolen during the burglary. They identified a similar Colt Frontier Scout revolver previously introduced into evidence, and the broken pieces of gun grips found with Miss Spahn's remains, as resembling the gun and attached grips which were taken. Evidence was introduced verifying the fact that the burglary victims owned the make and model of the revolver claimed. In addition, the State called a representative of the Firearms Division of Colt Industries, who identified the broken pieces of gun grips found with the remains of Miss Spahn as from a gun of the "Frontier Scout" series. The State also introduced testimony of defendant's family members and friends linking defendant to the burglary and the items stolen.

The basis for defendant's contention is the general rule that other crimes are inadmissible in a criminal trial to prove that the defendant committed the crime in issue.

*See* 29 Am.Jur.2d, *Evidence* § 320 (1967); *Delaware Uniform Rules of Evidence,* Rule 404(b) (Michie Cum.Supp.1980). Although defendant has correctly stated the general rule, it is quite apparent that that rule has no application to the evidence complained of here. The evidence concerning the July 13, 1976 burglary, which occurred approximately four months prior to Miss Spahn's disappearance, was not introduced to prove that the defendant was a person of criminal nature. Rather, its submission was intended to establish a direct link between the defendant and the pieces of gun grips found near the remains of Miss Spahn. In other words, the evidence was introduced to identify the defendant circumstantially as the murderer of Miss Spahn. 29 Am.Jur.2d, *Evidence* § 322 (1967); *Delaware Uniform Rules of Evidence,* Rule 404(b) (Michie Cum.Supp.1980). The evidence was relevant. There was no error by the Trial Judge.

## Argument XVI

The defendant testified on his own behalf at trial. In this appeal, the defendant contends that the State improperly cross-examined the defendant (1) as to the advice defendant's counsel had given him with respect to possible hair comparison evidence, which advice the defendant disclosed to a close friend in a letter, and (2) with respect to the July 13, 1976 burglary, defendant's use of marijuana and defendant's testimony regarding his selling of firearms. The defendant argues that the questioning with regard to contention # 1 violated defendant's attorney-client privilege, and that the questioning involved in contention # 2 was highly prejudicial.

 With respect to contention # 1, defendant's argument as to the attorney-client privilege must fail. It is clear that he waived the privilege when he disclosed the information conveyed to him by counsel in a letter to a close friend. *Delaware Uniform Rules of Evidence,* Rule 510; *See* 81 Am. Jur.2d *Witnesses* § 223 (1976); McCormick, *McCormick on Evidence* § 93 (2d ed. 1972).

In regard to contention # 2, the record shows that no objection was made by defense counsel when the State in quick succession asked the defendant questions concerning the above-mentioned topics in an apparent impeachment attempt. Thus, the plain error standard of review is applicable. Under this standard, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial. *Bromwell v. State,* Del.Supr., 427 A.2d 884, 893 n. 12 (1981). In the instant case, the State's questioning briefly touched upon topics the defendant freely testified to during direct examination. We fail to find any error in the State's cross-examination of the defendant, much less plain error.

## Argument XVII

Defendant contends that the State, during its closing remarks to the jury, improperly commented upon the defendant's involvement in the July 13, 1976 burglary, his purchase and sale of guns and use of drugs. The contention is meritless. We have reviewed the record and agree with the Trial Judge's post-trial conclusion that "the State's summation consisted of fair comment on the evidence in the record."[6]

## Argument XVIII

Defendant raises the question of whether the Trial Judge erred as a matter of law in failing to instruct the jury on the lesser-included offenses of Murder Second Degree, 11 *Del.C.* § 635, and Manslaughter, 11 *Del.C.* § 632. The defendant contends that the jury should have been allowed to consider these lesser charges as there was "a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting him of [an] included offense." 11 *Del.C.* § 206(c). We find that there was no "rational basis" for the Trial Judge to have charged the jury with the above-mentioned lesser-included offenses. There is nothing in the record which would

"support a jury finding under the particular instruction[s] sought." *Derrickson v. State,* Del.Supr., 321 A.2d 497, 501 (1974). The facts of this case gave rise to only one of two choices: guilty of Murder First Degree, 11 *Del.C.* § 636, or innocent. A jury of twelve citizens chose the former. There was no error on the Trial Judge's part in charging the jury.

## Argument XIX

In this segment of his appeal, defendant asks this Court to review all of the contentions and issues the defendant has raised in this appeal, which we have done, and determine whether "cumulatively they amount to prejudice", so that a new trial must be awarded. *Wright v. State,* Del. Supr., 405 A.2d 685, 690 (1979) citing *Robelen Piano Co. v. DiFonzo,* Del.Supr., 169 A.2d 240, 248 (1961). In response, we must answer negatively. We have not found prejudicial errors in the record. While the trial was long and required the Trial Judge to make some difficult discretionary decisions, the trial was fair and just.

## Argument XX

There is no merit to the defendant's contention that the evidence adduced at trial was insufficient to sustain the defendant's conviction. The evidence for the State was strong. The direct and circumstantial linkage between the murder of Miss Spahn and the defendant was clearly drawn. The defendant had a full opportunity to give his version of the events. A reasonable jury could reasonably find, based on all the evidence, that the defendant was guilty of Murder in the First Degree beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, reh. den. 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979). The jury in fact found the defendant guilty as charged. There is no basis to reverse the jury's decision.

---

6. Defense counsel failed to timely object to the State's remarks and thus the "plain error" standard of review is applicable. But, even without that stricter standard, we are in complete harmony with the Trial Judge's conclusion.

## Argument XXI

In tandem with defendant's contention made in Argument XIV, defendant contends that he was denied his right to be present at every stage of trial [7] by reason of his absence from the in-chambers *voir dire* examination of jurors # 11 and # 9 for possible juror prejudice. Defense counsel requested defendant's presence prior to the initial interview of juror # 11, but the request was denied by the Trial Judge. Defendant's absence from the in-chambers *voir dire* examination, it is argued, requires reversal of his conviction.

In support of his argument defendant cites to *Shaw v. State,* Del.Supr., 282 A.2d 608 (1971). In *Shaw,* this Court noted that Superior Court Criminal Rule 43 specifically provided for the defendant's presence at "the return of the verdict", *Id.* at 609, n. 1, and held that it was reversible error to permit the jury's verdict to be returned in the defendant's felony case when the defendant was involuntarily absent due to illness and had not waived his right to be present. The defendant, in that return of verdict situation, was not required to show prejudice. Here, however, Superior Court Criminal Rule 43 and its Sixth Amendment confrontation underpinnings do not supply such a readily apparent answer. Defendant attempts to focus upon the Rule's language requiring the defendant to be present during the "impaneling of the jury" and submits that "no apparent reason exists why the proceeding at issue herein should be treated in any different fashion." Indeed, defendant has cited a Maryland case which directly supports his position. *See Bunch v. State,* Md.App., 281 Md. 680, 381 A.2d 1142 (1978).

But we do not think that this midtrial issue lends itself to such a simple answer. *Compare also Hooks v. State,* Del.Supr., 429 A.2d 1312, 1314 (1981). We are not dealing here with a traditional and formal confrontation stage of the trial such as the impaneling of the jury, the return of the verdict or the imposition of sentence. Furthermore, the need for a juror to communicate to the judge about an irregularity demands an atmosphere conducive of candor and free expression. The need for a judge to call in a juror equally needs an atmosphere of confidence and respect and not an accusatory confrontation. In short, there can be factors which weigh against the defendant's presence. Consequently, it has been said that "whether the court may converse with a juror without the defendant's presence" ... "must in the end be left largely to the discretion of the court." 8B Moore's Federal Practice, ¶ 43.03[3] at 43–26 and 43–27 (2d ed. 1976), *United States v. Woodner,* 2d Cir., 317 F.2d 649, 652 (1963), cert. den. 375 U.S. 903, 84 S.Ct. 192, 11 L.Ed.2d 144 (1963). We agree for the above reasons.

We hold that this case is distinguishable on its facts and not governed by *Shaw.* The trial transcript of the initial interview of juror # 11 reveals his report that juror # 9 expressed a fear during a lunch break that the defendant might have access to the jurors' names and addresses. We are convinced that the particular problem dealt with by the Trial Judge, two defense counsel and two State prosecutors would have been impeded, rather than helped, by defendant's presence. *See* 8B Moore's Federal Practice, ¶ 43.03[3], at 43–27 (2d ed. 1976). The disclosures would have justified the Trial Judge's denial of defense counsel's

---

**7.** This right is provided for in Superior Court Criminal Rule 43:

"In all cases where the Superior Court has or is exercising original jurisdiction over an offense the defendant shall be present at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by these Rules. In cases where the Superior Court is exercising appellate jurisdiction over an offense the defendant's presence at the arraignment is not required if counsel is present and enters a plea in the defendant's behalf; the defendant's presence in such case shall be otherwise required as set forth above. In prosecutions for offenses not punishable by death, the defendant's voluntary absence after the trial has been commenced in his presence shall not prevent continuing the trial to and including the return of the verdict. A corporation may appear by counsel for all purposes. The defendant's presence is not required at a reduction of sentence under Rule 35."

request to have the defendant present during the subsequent *voir dire* interviews of jurors # 9 and # 11. We do not view the defendant's absence as frustrating the fairness of his trial. *Faretta v. California*, 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562, 572 (1975). To the contrary, it may well have put the jurors at ease. Moreover, it is clear that there was no prejudice. The presence of defense counsel during the interview of jurors # 11 and # 9 provided adequate safeguards for the integrity and fairness of defendant's trial. See *United States v. Brown*, 6th Cir., 571 F.2d 980, 987 (1978). There was a complete record made of the proceedings. In retrospect, discretion was not abused and, in any event, there was no violation of Rule 43 prejudicial to any right of the defendant.

Conclusion

The judgment of the Superior Court is affirmed.