Rafael DIAZ, Defendant-Appellant,

v.

STATE of Delaware, Plaintiff-Appellee.

Supreme Court of Delaware.

Submitted: Feb. 5, 1986.

Decided: April 14, 1986.

Rehearing Denied: May 27, 1986.

David J. Facciolo (argued), Office of the Public Defender, Wilmington, for defendant-appellant.

Timothy J. Donovan, Jr. (argued) and Loren C. Meyers (argued), Dept. of Justice, Wilmington, for plaintiff-appellee.

Before McNEILLY, MOORE and WALSH, JJ.

McNEILLY, Justice:

On July 7, 1980, Norma Jean Gelsinger was killed by a rifle blast. The defendant, Rafael Diaz, was charged with first degree murder and possession of a deadly weapon during the commission of a felony. A jury convicted him of the lesser included offense of second degree murder and possession of a deadly weapon during the commission of a felony. He was sentenced to thirty years incarceration for the weapons conviction and life imprisonment without furlough or release for the murder conviction. The defendant appeals to this Court on several grounds, the most significant of which is his contention that he was not competent to stand trial.

I

At the time of the offenses, the defendant, Ms. Gelsinger, and Ms. Gelsinger's three daughters, Brenda, Lydia, and Noelia Cintron, lived together in a trailer in Hockessin, Delaware. The defendant and Gelsinger had been living together for approximately nine years. On the evening of July 7, 1980, all five family members were at home. According to the testimony of Brenda Cintron, sixteen years old at the time, all five went to bed sometime after 9:00 p.m. that evening at the conclusion of a televised boxing match. Brenda went to her room located next to the living room. Approximately five minutes after retiring, Brenda heard her mother and the defendant arguing in their bedroom. She then heard the defendant pick up his rifle and some ammunition and go into the living room. She heard him put a shell in the rifle. The defendant then walked back to the master bedroom and the argument resumed. The defendant and Gelsinger left the bedroom and continued their argument in the hallway and living room. Brenda heard the defendant hit Gelsinger and heard her mother fall into the living room couch with such force that items hanging on Brenda's wall fell off. The defendant

then said, "Somebody is going to pay for it,"[1] and the gun went off.

Brenda ran into the living room and saw the defendant standing there with the rifle in his hands and her mother slumped over the couch bleeding heavily from her abdomen. Brenda heard her mother say "I love you, my three girls," and then something that sounded like "accident."[2] The victim was dead by the time the ambulance crew arrived. The state medical examiner testified that the victim died of internal bleeding caused by a gunshot wound to the abdomen. In a statement made to the police and admitted into evidence, the defendant contended that the rifle had gone off accidentally as he carried it with him in his right hand, having decided to sleep in the car following his argument with the victim.

Following the defendant's indictment, a competency hearing was held. On December 11, 1980, the Superior Court issued an order declaring the defendant incompetent to stand trial and committing him to the Delaware State Hospital until such time as he might become competent.

Upon receiving a letter dated March 9, 1983 from the Director of Forensic Services at the State Hospital stating that in the opinion of the Hospital's forensic team the defendant was then competent to stand trial, the Superior Court held a second competency hearing on April 14, 1983. As a result of that hearing, the Court determined that the defendant was in fact competent. However, some eight months later, in response to a motion by defense counsel, the Court ordered a re-evaluation of competency. Several re-examinations were conducted, but as a result of a hearing on July 3, 1984, the Court again declared the defendant competent to stand trial.

Trial was held and the jury found the defendant guilty of second degree murder and possession of a deadly weapon during the commission of a felony. After conviction but before sentencing, the defendant's condition deteriorated and he was again placed at the Delaware State Hospital by order of the Superior Court. Upon further examination, it was determined that the defendant was competent to undergo sentencing. Following his sentencing, the defendant appealed to this Court.

## II

The defendant's primary argument on appeal is that the Superior Court erred in finding him competent to stand trial.

### A.

■ The test of competency is set forth in 11 *Del.C.* § 404(a), which provides in pertinent part:

> Whenever the court is satisfied, after hearing, that an accused person, because of mental illness or mental defect, is unable to understand the nature of the proceedings against him, or to give evidence in his own defense or to instruct counsel on his behalf, the court may order the accused person to be confined and treated in the Delaware State Hospital until he is capable of standing trial.

*Id.* Put another way, the test is "whether or not the defendant has sufficient present ability to consult with his lawyer rationally and whether he has a rational as well as a factual understanding of the proceedings against him." *Williams v. State*, Del. Supr., 378 A.2d 117, 119 (1977) (citing *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)), *cert. denied*, 436 U.S. 908, 98 S.Ct. 2241, 56 L.Ed.2d 406 (1978). The prosecution must prove the defendant's competence by a preponderance of the evidence. *See United States v. DiGilio*, 3d Cir., 538 F.2d 972, 988 (1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct.

---

**1.** In a statement made to police at the time of the incident and admitted into evidence at trial, Brenda's sister, Lydia Cintron, said she heard the defendant say "We're through" just before the gunshot.

**2.** In a separate but similar statement made to police at the time of the incident and admitted into evidence at trial, Brenda said that when she went into the living room after the shooting, the defendant said, "I'm sorry. I never meant it. It was an accident."

733, 50 L.Ed.2d 749 (1977); *People v. McCullum*, Ill.Supr., 66 Ill.2d 306, 5 Ill. Dec. 836, 839–40, 362 N.E.2d 307, 310–11 (1977). This burden of proof is sufficient to protect a defendant's due process rights because at issue is defendant's competence to stand trial, not his guilt or innocence or any element of a crime. *See United States v. Makris*, 5th Cir., 535 F.2d 899, 906 (1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977).

### B.

■ The incompetency argument of defense counsel centers around the defendant's inability to assist his counsel at trial. Counsel on appeal contends the record is replete with instances where the defendant could not assist his trial counsel. He notes that trial counsel, at one of the competency hearings, remarked to the Court that the defendant was unable to listen to the proceedings. He also notes that trial counsel told the Court at trial that he could not work with the defendant or confine him to questions in particular areas.

Counsel also points to certain behavior of the defendant seemingly out-of-place in a trial setting, including muttering persistently under his breath, breaking out into mild laughter and smiles, looking around the courtroom, drumming his fingers on the table, responding in a nondirected and babbling manner, talking out loud to himself, and telling his attorney he felt like he was "going to the moon."

Finally, counsel asserts that although the psychiatrists who testified just prior to and during the trial were of the opinion that the defendant was competent, they did state that he had a "vague paranoid kind of quality," labeled a "personality disorder," and that he was ill and might possibly become psychotic. This testimony, so counsel argues, is indicative of either a mental illness or a mental defect which rendered the defendant unable to assist his trial attorney and thus incompetent under 11 *Del.C.* § 404(a).

### C.

Between March 1983 and the conclusion of trial in July 1984, the defendant was examined to determine his competency to stand trial a total of at least six times by one psychologist, who had declared the defendant incompetent in September 1980, three psychiatrists, and the forensic team at the Delaware State Hospital. The conclusion at the end of each examination was that the defendant was competent to stand trial. No expert testified during this period that the defendant was incompetent. In addition, before the trial began, defense counsel agreed that the defendant was not legally incompetent and that the trial should go forward, even though counsel was not able to work effectively with the defendant. During the competency hearing in the middle of trial requested by defense counsel, counsel conceded that the testifying psychiatrist's conclusions suggested that the only problems that existed were a result of the defendant's own making and not of any mental illness. Defense counsel made no application to the Court to have the defendant declared incompetent.

In light of the above, we believe that the defendant, though a distracted individual, was not incompetent at the time of trial under the test of 11 *Del.C.* § 404(a). There is sufficient evidence on the record from which the Superior Court could find by a preponderance of the evidence that the defendant was able to consult with his lawyer rationally and that he had a rational as well as factual understanding of the proceedings against him. *See Williams*, 378 A.2d at 119.

### III

The defendant also raises five other grounds for reversal. We will address each in turn.

### A.

The defendant contends the trial court abused its discretion in allowing the admission of evidence of certain of his prior bad acts. The State, through the testimony of

Lydia Cintron, attempted to prove the defendant's intent to kill the victim, in part, by introducing evidence that during their arguments defendant often struck the victim—punched, slapped, and kicked her—and that the victim was often injured as a result and frequently went to the hospital. The defendant objected to the admission of this evidence, contending it was irrelevant and prejudicial. On appeal, defendant argues that the evidence was inadmissible because it was not plain, clear, and conclusive as required by *Renzi v. State*, Del. Supr., 320 A.2d 711, 712 (1974), and because it did not meet the balancing test of Rule 403 of the Delaware Uniform Rules of Evidence.[3]

■ Generally, proof of prior criminal or bad acts by a defendant is not admissible in evidence. *Johnson v. State*, Del. Supr., 311 A.2d 873, 874 (1973). An exception to this rule exists when the evidence is offered to prove intent, identity, or a common scheme. *Bantum v. State*, Del.Supr., 85 A.2d 741, 745 (1952). *See, e.g., Dutton v. State*, Del.Supr., 452 A.2d 127, 145 (1982) (evidence of prior burglary by defendant admissible to circumstantially identify defendant as murderer). These principles are presently codified in D.R.E. 404(b).[4] In addition, as we stated in *Renzi*, in order for a prior crime to be admissible to prove intent, there must be substantial evidence that the defendant committed the crime, and the evidence must be plain, clear, and conclusive. 320 A.2d at 712.

■ Because the State attempted to convict the defendant of first degree murder, defendant's state of mind—his intent to kill—was vitally important to the prosecution of the case. The defendant's violent and abusive behavior toward the victim was probative of the defendant's attitude toward the victim and therefore of an intentional, not accidental, killing. Moreover, Lydia Cintron had been an eyewitness to the defendant's prior acts of physical abuse of the victim, and her testimony plainly indicates that such acts had in fact taken place. Thus, we find the *Renzi* standard was satisfied. Finally, in light of the defense that the shooting was accidental, we find the trial court was correct in determining pursuant to D.R.E. 403 that the probative value of the evidence outweighed its potential for unfair prejudice. We conclude, therefore, that the trial court did not abuse its discretion in allowing the admission of defendant's prior bad acts.

### B.

■ Next, the defendant argues that the Superior Court abused its discretion when it permitted the admission of a photograph of the victim's torso taken by the medical examiner showing the gunshot wound entrance and a blunt force injury below the right breast. Defendant contends the photograph was irrelevant and highly prejudicial and thus inadmissible under D.R.E. 403.

A trial judge has broad discretion to admit or reject photographs depicting a victim's injuries, and absent an abuse of discretion, that ruling will be upheld by this Court. *Casalvera v. State*, Del.Supr., 410 A.2d 1369, 1372 (1980). As set forth in D.R.E. 403,[5] the test of admissibility of photographs is whether the probative value of the proffered evidence substantially outweighs the danger of unfair prejudice. *Dickens v. State*, Del.Supr., 437 A.2d 159, 162 (1981).

---

**3.** D.R.E. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.

**4.** D.R.E. 404(b) provides:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

**5.** *See supra* note 3.

The photograph at issue was probative of the victim's cause of death, as it showed the gunshot wound entrance. It was also probative of the defendant's intent to kill the victim, a central issue in the case. The photograph showed the breast contusion, clearly corroborating Brenda Cintron's testimony that the defendant hit the victim so hard she fell against the living room couch. This, in turn, tends to indicate the intentional nature of the shooting. Accordingly, we find no abuse of discretion in the trial court's decision to admit the photograph into evidence.

## C.

■ The defendant also alleges a violation of his due process rights by the State's failure to conduct a neutron activation test on cotton swabs that had been run over his hands approximately three hours after the shooting to test for the presence of gunpowder residue. The defendant claims this "negligence" by the State was prejudicial to his case because the test would have been most helpful in determining whether the rifle had been held in one hand or two at the time of discharge and thus in developing the defense of accident. Defendant argues that the State breached its duty to preserve and disclose the evidence under *Deberry v. State*, Del.Supr., 457 A.2d 744 (1983).

The State contends that the swabs were hand delivered to the F.B.I. laboratory in Washington, D.C. for testing, but that for some unknown reason, the F.B.I. technician mistakenly concluded that fourteen hours had elapsed between the time of the shooting and the swabbing of the defendant's hands, not three hours as was in fact the case. As a result, because gunpowder residue does not remain on hands for fourteen hours, the laboratory never performed the neutron activation test. It appears that the error was not discovered until the trial was in progress, some four years later.

When the error was discovered at trial, the defendant did not raise an objection or request the trial judge to take any action on account of the nonperformance of the test. Because the question was not fairly presented to the trial court, the record is incomplete and inadequate as to the reasons for the error. The issue, therefore, may not be raised now for the first time. *See* Supreme Court Rule 8. Moreover, upon our review of the scant record concerning this issue, we find no breach of duty by the State under *Deberry*.

## D.

The defendant next alleges the Superior Court abused its discretion in refusing to declare a mistrial because of a certain remark made by the prosecutor in his opening argument. In the context of stressing to the jury the importance of the case to both sides, the prosecutor at the end of his argument asked the jury to "remember that this is Norma Gelsinger's only shot at achieving justice as well." Defense counsel promptly requested a mistrial, objecting to the statement as an effort to appeal to the passion and prejudice of the jury. The trial judge denied defendant's request for a mistrial, but gave a cautionary instruction to the jury, reminding the jurors to decide the case solely on the evidence presented and telling them to disregard the prosecutor's remark.

■ As we stated in *Sexton v. State*, Del.Supr., 397 A.2d 540 (1979), only prosecutorial remarks that prejudicially affect substantial rights of the accused require reversal. *Id.* at 544 (citing *Edwards v. State*, Del.Supr., 320 A.2d 701, 703 (1974); Super.Ct.Crim.R. 52(a)). Even when prejudicial error is committed, it will usually be cured by the trial judge's instruction to the jury to disregard the remarks. *Edwards*, 320 A.2d at 703. *See, e.g., Boatson v. State*, Del.Supr., 457 A.2d 738, 743 (1983) (immediate and thorough instruction to jury to disregard statement mitigated statement's effects). In determining whether the remark in the case presently before us requires reversal, we look to the three-pronged test adopted by this Court in *Hughes v. State*, Del.Supr., 437 A.2d 559

(1981), examining the closeness of the case, the centrality of the issue affected by the alleged error, and the steps taken to mitigate the effects of the error. *Id.* at 571.

The case against the defendant was not close. His state of mind was the only disputed issue, and there was significant circumstantial and direct evidence of his recklessness, the requisite state of mind for a second degree murder conviction. The prosecutor's challenged reference to the victim was unrelated to any issue that was central to the case; the comment only pointed out the importance of the defendant's prosecution. Finally, the trial judge's cautionary instruction to the jury to disregard the prosecutor's remark mitigated any possible prejudice to the defendant. Thus, we conclude that under *Edwards* and *Hughes* the trial court did not abuse its discretion in refusing to declare a mistrial.

### E.

Finally, the defendant argues that the Superior Court committed prejudicial error by instructing the jury prior to the beginning of jury deliberations that the prosecution would not seek the death penalty in the event the jury returned a first degree murder verdict and by refusing to further instruct the panel that the resulting penalty in such event would be life imprisonment without probation or parole. These actions by the Court were entirely consistent with our opinion in *Dutton v. State*, Del.Supr., 452 A.2d 127 (1982). *Dutton* was based on the need to eliminate any jury confusion and anxiety regarding capital punishment. *Id.* at 135. Moreover, the trial court's refusal to instruct the jury on the life imprisonment penalty recognized that such an instruction could mislead the jury and that "[t]he jury has no role to play in the penalty of mandatory life imprisonment." *Id.* at 136. Finally, we note that the trial judge instructed the jury at the end of the trial to determine the defendant's guilt or innocence solely on the basis of the evidence. In light of the above, we find this last argument by the defendant to be without merit.

\* \* \* \* \* \*

AFFIRMED.