**Preston TUCKER, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: Dec. 13, 1988.
Decided: Sept. 11, 1989.
Rehearing Denied Oct. 13, 1989.

Bernard J. O'Donnell (argued), Asst. Public Defender, Wilmington, for appellant.

Rosemary K. Killian (argued), Deputy Atty. Gen., Wilmington, for appellee.

Before HORSEY, MOORE, and HOLLAND, JJ.

HORSEY, Justice:

In this appeal following defendant's conviction in Superior Court of unlawful sexual intercourse with a minor, defendant seeks a new trial, claiming reversible error in evidentiary rulings of the trial court and in the court's admission of testimony prejudicial to defendant. The contested testimony consists principally of out-of-court hearsay statements of the nine-year-old victim and her five-year-old brother concerning the sexual assault, as well as the admission of third-party hearsay statements of prior sexual acts by defendant with the child. Defendant also asserts a Sixth Amendment claim of denial of right of confrontation.

Defendant, Preston Tucker, was indicted on one count of Unlawful Sexual Intercourse, First Degree, with the nine-year-old daughter of the woman with whom Tucker was living. Defendant was found guilty of the offense charged, 11 Del.C. § 775; and following denial of defendant's motion for judgment notwithstanding the verdict or for new trial, defendant was sentenced to life imprisonment.

On the day of trial, before opening statements, defendant moved the court to bar the admission of evidence of prior sexual contact between victim and defendant that was not "plain, clear and conclusive" under D.R.E. 404(b) as interpreted in *Diaz v. State*, Del.Supr., 508 A.2d 861 (1986). Defendant also sought a ruling *in limine* barring the State from introducing any out-of-court statements of the victim made to her mother, the police, or any medical personnel that lacked the required voluntariness for admission under 11 Del.C. § 3507. Defendant asserts that the trial court committed reversible error in admitting, through third-party testimony, nine out-of-court statements of the victim and her brother, as well as evidence of victim having contracted venereal disease associated with prior sexual contact with defendant. Defendant also asserts a claim of a Sixth Amendment denial of right of confrontation from the refusal or unwillingness of the children to respond to questioning on cross-examination.

We find no plain error or error of law or abuse of discretion under 11 Del.C. § 3507 or under D.R.E. 803(4) in the court's admission of the several hearsay out-of-court statements of the children. The record confirms that the prior out-of-court statements of the children, offered by the State through victim's mother, hospital personnel, and the investigating police officer, were either admitted by waiver or consent or were otherwise properly found by the court to meet the controlling rules of evidence. Inasmuch as the children were also present at trial and were made available for cross-examination, we further find that declarants were not unavailable within the meaning of D.R.E. 804(a) and that defendant was not denied his Sixth Amendment right of confrontation through the children's failure to respond to defendant's entire line of questioning. *Cf. United States v. Owens*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988); *Delaware v. Fensterer*, 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985). Finally, we find no reversible error in the court's "other crimes" rulings under D.R.E. 404(b).

I

The evidentiary and legal issues raised are largely fact-driven; and an understanding of the manner in which such evidence was ultimately admitted requires a fairly detailed recital of the facts and the sequence in which the evidence was admitted at trial.

On October 14, 1986, Jill Harper[1] had been living off and on with her boyfriend, Preston Tucker, in her home in Wilmington, Delaware, for about five years. The other occupants of the home were Jill's two children, a nine-year-old daughter, Esther, the victim, and her five-year-old brother, Craig.

During the afternoon of October 14, Jill had been away from the home visiting a relative and drinking alcoholic beverages. About 7:00 p.m. she telephoned defendant to meet her downtown so they could walk home together. They met, but an argument followed and they parted company. Defendant, known to all as "Chessie," returned home first, entered the house unseen through the back door, and went to the couple's second-floor bedroom. There he found both children lying on the bed watching television. In the presence of Craig, defendant allegedly had sexual intercourse with Craig's nine-year-old sister, Esther, committing the offense of which he was found guilty.

In the meantime, Jill had returned home but had remained out on the sidewalk talking to a relative. When Jill later entered the house, she went upstairs and found her children and Chessie watching television. Jill and Chessie resumed their argument, which became "heated," leading Jill to lock herself in the second-floor bathroom. When Chessie threatened to kick in the door, Jill opened the door, Chessie spat in her face, and Jill ran down the stairs and out the front door. Defendant pursued her with a stick and the children followed. When defendant began beating Jill around her legs with the stick, Esther grabbed another stick and began striking back at Chessie. Each time Esther hit Chessie, he hit Jill, until, as defendant put it, he began to tire of the "game." According to Jill, while defendant was beating her, Esther shouted to Chessie, "Since you are trying to hurt my Mom, I'm going to tell my Mom *how you raped me.*"

Jill immediately took her children and fled to a neighbor's home. There Jill telephoned the City of Wilmington police and reported defendant's assault on her daughter and her daughter's statement of having been raped.

Detective Tabor and another officer of the Wilmington police "responded" to the neighbor's home. After determining Esther to be the "victim," Detective Tabor spoke separately, first with Esther and then with her brother Craig, questioning each on what had happened. Esther told Detective Tabor that "Chessie" had "tried to stick [his penis] in her." Craig told the detective, "He did it to her." Detective Tabor then arranged for Esther to be taken to a local hospital for a medical examination and for Jill and Craig to accompany her.

At the hospital Detective Tabor again separately questioned both Esther and Craig concerning what had happened in the bedroom. In essence, each repeated in somewhat more detail what each of them had earlier told the detective concerning what defendant had done.

An emergency room physician, Dr. Denise Gavula, examined, questioned, and treated Esther at the hospital that night. She found the child's vaginal area to be very irritated and sore, her vagina opening unusually loose, "gapping," and a discharge from it, a condition later diagnosed as chlamydia. Dr. Gavula and other medical personnel concluded and noted in the hospital record that the child had probably been raped, reportedly by her mother's boyfriend, the defendant.

Later the same night, at about 11:30 p.m., the police took defendant Tucker into custody. On being advised of his Miranda rights, defendant at first refused to make any statement. Early the following morning, at 1:45 a.m., defendant, while being fingerprinted, changed his mind and gave Detective Tabor a statement, denying that he had either sexually touched the child or

---

1. The Court has substituted pseudonyms for the names of the mother, the victim, and her brother.

had sexual intercourse with her. However, defendant was then placed under arrest.

Three days later, Detective Tabor reinterviewed Esther and her brother Craig at the police station; and three months later the detective made a video recording of Craig's demonstrating with the use of anatomically correct dolls what he had seen defendant do to Craig's sister, the victim.

### A.

On the first day of trial, in the course of victim's testimony as the State's first witness in its case-in-chief, defendant sought to exclude all prior out-of-court statements of the victim made either to her mother, Detective Tabor, or to medical personnel. Defendant's basis for exclusion was lack of voluntariness under 11 *Del.C.* § 3507 (see footnote 9 below). The court found, on the limited record before it, the victim's prior statements to her mother and to Detective Tabor to be voluntary and therefore admissible under section 3507. However, the court found the record inadequate to determine the admissibility of victim's prior statements made to hospital personnel, including Dr. Gavula. The court denominated its rulings as "preliminary." Defendant's exclusion motion did not encompass any prior out-of-court statements of victim's brother Craig.

The State, as both parties anticipated, was unable to elicit from either the victim or from her brother Craig, its second witness, any testimony of a specific nature to establish an essential element of unlawful intercourse in the first degree (rape), specifically penetration. On direct examination, Esther would testify only as to peripheral matters. She would answer no questions directed to proof of the alleged rape itself. Esther was willing to testify concerning: her brother's presence at the time; her relationship with Chessie, the defendant; and his stick-beating of her mother. She also acknowledged her statements to both her mother and to Detective Tabor about what had happened that day to her.

Thus, Esther testified on direct examination that she had told her mother and Detective Tabor that evening that Chessie "did [something] to [her]," but she refused to state or describe what he actually did. Each time that Esther was asked on direct, and later on cross-examination, a direct question as to the alleged sexual act, Esther answered all such questions either by silence or by stating, "I don't know," or by indicating that she could not remember.

On cross-examination of victim, Esther confirmed that she had used the word "rape" in her statement to Chessie while he was striking her mother with a stick. Esther also testified that she had told the truth when she had first spoken to her mother and to the detective, and later to the doctor at the hospital, about what defendant had done to her. In the course of defendant's cross-examination of victim, the trial judge also noted for the record, out of the presence of the jury:

> There is an interesting bit of dynamics going on, which I want to record for the record. I'm not sure which way it goes. I don't pretend to take any position one way or the other. The defendant changed his seat so he could have a more direct view of the witness. It's clear that he has a constitutional right to confront the witness, but in that recent exchange, there was eye contact and part of the witness's response was as a result of facial expressions, not threatening, not menacing, that the defendant made.
>
> I'm just recording it for the record. I take no position on it one way or the other. I'm certainly not asking the defendant to move, and I certainly am not suggesting that he attempted to intimidate the witness. But I wanted you to be aware that I'm aware of it and have now recorded it for the record, in case it ever becomes necessary for anybody to analyze the witness's testimony.

Shortly thereafter defendant himself requested leave to cross-examine the witness [2] and the request was denied. Coun-

---

**2.** Defendant maintained that, in his opinion, victim "[had] an I.Q. of a sixteen-year-old." Vic-

tim was described in the hospital records as

sel then ceased further cross-examination of the witness but stated that his examination had only begun.

On the second day of trial, the State, before recalling Esther to complete her testimony, called, in successive order, her brother Craig and her mother. As previously noted, Craig was unwilling or unable to testify concerning the act with which defendant was charged. Esther's mother, under cross-examination, recounted her daughter's exclamatory statement made to the defendant in the midst of the stick episode, "Now I'm going to tell my mother how you raped me." Esther was then recalled briefly for both direct and cross-examination; and in neither instance was she willing or able to respond to questioning going to the ultimate issue of penetration. On direct examination, when asked to recount what happened, she stated:

A. Well, when I was in my room, me and my brother, we was in my mom's room. And so we was watching Wheel of Fortune. And then Chessie came into the room and tried to kiss all on me.

Q. And then what happened?

A. And then—

Q. How were you dressed that day? What kind of clothes did you have on?

A. Pants and a shirt.

Q. What did Chessie have on?

A. (No response.)

Q. What happened to your clothes that day? Did anything happen?

A. No.

Q. Did anything happen to Chessie's clothes that day?

A. (No response.)

Q. When Chessie tried to kiss all over you, did you say anything to him?

A. Yes.

Q. What did you say?

A. "Get off."

Q. Where was he when you said, "Get off?"

A. (No response.)

\* \* \* \* \* \*

"well-developed ... look[ing] older than her

Q. [Esther], you said you told Chessie to get off of you?

A. Yes.

Q. What did he do when you said that?

A. (No response.)

\* \* \* \* \* \*

Q. [Esther], are you going to be able to tell the jury today about what happened to you in the bedroom with Chessie when he was kissing all over you?

A. (No response.)

Q. Can you do it, do you think?

A. (No response.)

Q. Is that a yes or no? Can you make a yes or no?

A. (No response.)

\* \* \* \* \* \*

Q. My question is: Do you think you can today tell what happened in the bedroom when Chessie was kissing all over you? And are you saying yes, you can tell, or no, you can't tell?

A. (No response.)

Q. Sometimes it helps—would you like to tell the judge—would it be better if you could look at the judge and tell him? Would that make it easier? Do you want to do that?

A. (No response.)

Q. [Esther], if you can't do it, you can say no.

A. (No response.)

[STATE]: I think I'll rest for the moment, your Honor.

On cross-examination, victim again stated that she had used the word "rape" in her previously recounted shouting statement to defendant outside the home.

On the morning of the third day of trial, the State informed the court that Esther had asked the prosecutor if she could speak to the trial judge. After eliciting counsel's position, and over defendant's objection, the court concluded that it should examine Esther outside of the presence of the parties or counsel, but in the presence of a social worker and the court reporter. The court expressed concern that the witness

stated age."

might wish to report possible intimidation or excess influence and granted the request to find out what the witness wanted to say.[3] After the court concluded its *in camera* examination of victim, the court provided counsel with the transcripts of the in-chambers interview; and the trial proceeded.

The State then moved for the admission in evidence of victim's entire hospital record; and the court admitted the entire record over defendant's *limited* objection. Defendant's objection was confined to a single entry, the doctor's discharge diagnosis of "probable rape." Defendant had no objection to the hospital record's admitting diagnosis of "alleged rape," the medical personnel entry of the child's chief complaint as "possible rape," or the other entries principally made by Dr. Gavula, hereafter referred to. Indeed, defendant had earlier requested leave to use the hospital record when he resumed cross-examination of victim.

The State then called the child's examining and treating physician, Dr. Gavula. Relying in large part upon her entries in the hospital record made in the course of her examination and treatment of victim, Dr. Gavula stated:

A. When I asked her [the victim] what happened, she states—I'll read it. "She states, 'He only stuck it in a little bit.'" When I asked her before that, she also stated that, "He took off my clothes . . ."—this isn't what is written here, but, "He took off my clothes, and he took off his clothes. He held me down against the bed and tried to stick it in."

Q. Did she indicate who "he" was?

A. I believe she referred to her mother's boyfriend. She didn't mention a man's name.

Q. Did she indicate to you when that happened?

A. I asked her, "How long ago did this happen?" And she couldn't give me a time, but she said it was just that night.

Q. Did she refer to any other time?

A. She made—we had asked her if this had ever happened before or if anybody had ever done anything like this to her before. And she stated that "It occurred about a week ago."

Q. Did she make reference to who the person was who did it to her a week ago?

A. Yes. And she said—I asked her, "Was it anybody different? Was it the same person?" She said it was the same person.

The doctor, noting a vaginal irritation and discharge and that the vagina opening was gaping, reddened, and slightly bleeding, stated that the condition was consistent with the child's allegations. She then referred the child to another hospital for further lab work, tests and ultimate diagnosis of the child's having chlamydia, a sexually transmitted disease. Defendant entered no objection to the State's entire line of questioning of the doctor.

Defendant's cross-examination of Dr. Gavula exceeded the scope of the State's direct. After closely interrogating the physician on all aspects of her medical findings, including the disease of chlamydia and Esther's statements to the physician, defendant probed the doctor's opinion on the

---

**3.** The court explained its decision as follows:

This is an extraordinary situation. I have never had this request before. Because it's extraordinary, there is not a lot of guidance on how to proceed. I was particularly concerned about the defense position. Here is what I'm inclined to do. I don't know what it is that the child wants to tell me. And we could fantasize and imagine what it's going to be. Depending on what it is, maybe it's something I should not be aware of. But since it could be relevant to the conduct of this trial, I think I have an obligation to hear that information.

What I'll do is hear what she has to say with the reporter. And I'll ask that the social worker who has been with her, accompany her—not for purposes of offering any information, but simply so that we have a witness. And what I'll probably do, depending on what I hear, is seal this portion of the record until it's determined, if it's determined, that it needs to be opened. But I can't make that decision until I hear what she has to say. But I think that will protect the defendant's rights, because we'll have a record of whatever information she wants to give me. But at this point, I think I have an obligation to hear what she has to say.

truthfulness of children generally who report claims of being abused·sexually.

Defendant then recalled Esther for further cross-examination, focusing primarily on Esther's *in camera* testimony and upon her out-of-court statements admitted through her mother and Dr. Gavula. However, when defendant sought to elicit from Esther her understanding of the word "rape," she gave no response. When questioned concerning her statements to Dr. Gavula and other hospital personnel, as reflected in the hospital record and Dr. Gavula's testimony, Esther had no recollection of making such statements. When questioned specifically as to whether she had told Dr. Gavula that "he only stuck it in a little bit," and whether she did not later identify the actor as "mom's boyfriend," Esther gave no answer and then began to cry. She did not respond when asked whether she had told another physician, Dr. Rowen, that her "mom's boyfriend" had "started kissing [her]" and "trying to take her clothes off." Defendant discontinued his cross-examination when the witness would not state whether she had recently spoken to the trial judge in his office.[4] Defendant then requested and was granted permission to have victim's *in camera* statement in chambers

read in its entirety to the jury by the court reporter. The State's final witness in its case-in-chief was Detective Tabor, whose testimony we later detail.

The defendant, testifying in his own defense, admitted having been in the bedroom with victim and her brother. He also admitted having struck the mother with a stick. However, defendant denied any physical contact with the victim on the day of the crime.

## B.

Before summation, the trial court declined, on grounds of waiver, defendant's motion to excise from the record all of victim's statements in the hospital records of prior sexual contact with defendant.[5] The court ruled that defendant had waived any objection to Dr. Gavula's testimony concerning victim's prior sexual contact with defendant[6] by expressly consenting to the admission of victim's hospital records and by making affirmative use of the evidence. The court, over the State's objection, did redact from the hospital record two sentences that included victim's reference to having prior sexual contact with defendant as not meeting the legal standard for admitting under D.R.E. 404(b).[7]

4. Esther, on being told that she could leave the witness stand, remained seated, after the jury had been excused. The court then noted on the record, "The witness is reluctant to leave the stand after she was dismissed by the Court and attempts were made to help the witness."

5. The State pointed out that victim's entire hospital record had previously been admitted, substantially without objection, and that both parties, in their examination of Dr. Gavula, had referred to Esther's statements of prior sexual contact with defendant.

6. The court also found other grounds for admitting Dr. Gavula's testimony:
Substantively, the physician's observations were made in the course of examining the victim and memorializing findings concerning a discharge from a vaginal infection. Although there was no objection this Court agrees that such findings were relevant since to have excluded them could have engendered speculation and could have created an inference unfavorable to the victim. These responses were clearly not made in the process of a criminal accusation but were a memorial-

ization of the physician's recollection about the victim's response. Furthermore, it should be noted that there was no timely objection to this line of questioning and in fact the defendant's attorney cross-examined on these same points.

7. The pertinent provisions of D.R.E. 404(a) and (b) are:
RULE 404. CHARACTER EVIDENCE NOT ADMISSIBLE TO PROVE CONDUCT; EXCEPTIONS; OTHER CRIMES.
(a) Character Evidence Generally. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
\*　\*　\*　\*　\*　\*
(b) Other Crimes, Wrongs or Acts. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

However, the court further ruled that the State, in closing argument, could refer the jury to Dr. Gavula's testimony as to victim's responses to questioning at the hospital of prior sexual contact with defendant.

The case was submitted to the jury on the indicted charge of unlawful sexual intercourse first degree, as well as five lesser included offenses. The jury, as previously noted, convicted the defendant of the indicted crime and rejected the five lesser included offenses.

### C.

Defendant moved for judgment of acquittal or new trial, asserting but two claims of error: one, plain error for the court's failure to give an instruction (not requested) that the jury exercise care in considering the out-of-court statements of the victim; and two, abuse of discretion by the trial judge in permitting Dr. Gavula to recount victim's assertion of defendant's prior sexual contact with her. The court denied both motions, finding neither argument to be supported by the record and otherwise waived. The court also found that the physician's findings made in the course of examination of the victim were clearly relevant and properly memorialized and admissible, including the physician's recollection of victim's response. D.R.E. 803(4).[8] The court also noted that defense counsel had cross-examined Dr. Gavula at length concerning the testimony he now sought to exclude. Following sentencing, defendant docketed this appeal.

### II

On appeal, defendant abandons lack of voluntariness under section 3507 as a basis for excluding any of the children's out-of-court statements and asserts instead a claim of constitutional error for their refusal to respond to certain questioning. He asserts that the trial court's admission of the children's out-of-court statements through Dr. Gavula and Detective Tabor denied him his Sixth Amendment right to confront "his child accusers." Defendant states that the children's failure to respond to his questioning directed to their prior statements demonstrates their lack of competency and reliability as witnesses. As a result, defendant argues that the children, though present and physically available for cross-examination, were not constitutionally "available" for Sixth Amendment purposes. Defendant also asserts that section 3507 is constitutionally defective unless there be read into it concern for the "quality" of the declarant's hearsay statement.

The State responds that the Court properly applied section 3507 in its preliminary rulings upon defendant's limited objections to victim's out-of-court statements based on voluntariness;[9] that the children's statements were later admitted by waiver and consent; and that defendant's confrontation claim is without merit.

■ We first address the issue of waiver and consent, which the State argues is dispositive of defendant's claim of plain error in the admission of *all* of the prior out-of-court statements of the children, an argument to which defendant fails to respond on appeal. Our rules of evidence and decisional law are clear. A party who fails "to raise timely objections to evidence in the trial court [risks] losing the right to raise

---

**8.** D.R.E. 803(4) provides:

RULE 803. HEARSAY EXCEPTIONS; AVAILABILITY OF DECLARANT MATERIAL

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

 * * * * * *

(4) Statements For Purposes of Medical Diagnosis Or Treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause or external course thereof insofar as reasonably pertinent to diagnosis or treatment.

**9.** 11 *Del.C.* § 3507 provides, in pertinent part:

§ 3507. Use of prior statements as affirmative evidence.

(a) In a criminal prosecution, the voluntary out-of-court statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.

(b) The rule in subsection (a) of this section shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not. The rule shall likewise apply with or without a showing of surprise by the introducing party.

evidentiary issues on appeal" in the absence of plain error affecting substantial rights. *Wainwright v. State*, Del.Supr., 504 A.2d 1096, 1100 (1986); D.R.E. 103(a) and (d).[10] Generally, plain error assumes oversight; that is, error "affecting substantial rights ... not brought to the attention of the court." D.R.E. 103(d). Further, plain error "is limited to material defects which are apparent ... basic, serious and fundamental in ... character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice." *Wainwright*, 504 A.2d at 1100. With this preliminary statement of the controlling law, we turn to the children's out-of-court statements.

The total number of out-of-court statements of the children that are implicated consist of six statements by the victim, Esther, and three by her brother Craig. Esther's six out-of-court statements include her recorded in-chambers testimony. Her five remaining out-of-court statements, in chronological order, were: (a) her statement recounted by her mother and which defendant on appeal now concedes to be admissible; (b) her two statements to Detective Tabor, one at home and the other at the hospital, which the court found admissible under section 3507 in a preliminary ruling which was not thereafter contested; and (c) victim's remaining two statements recounted by Dr. Gavula and admitted with her hospital records. All three of Craig's statements were offered through Detective Tabor and, as noted, were also admitted without defendant's objection at trial.

### A.

#### Victim's Brother's Three Out-of-Court Statements to Detective Tabor

■ Detective Tabor, the State's final witness, testifying without objection, recounted to the jury Craig's three statements made to him: the first at the neighbor's home; the second later the same evening at the hospital; and the third several weeks later at the stationhouse. In his first statement to Tabor, Craig stated that their mom's boyfriend [defendant] "did it to her [with their] pants off." At the hospital, Tabor recounted Craig as stating that defendant "got on top of her and was doing it to her," with Craig demonstrating by gyrating his lower body. In the detective's third videotaped interview with Craig at the stationhouse, Craig demonstrated what had occurred between defendant and his sister with anatomically correct dolls. When a monitor was not available at trial, the State called Detective Tabor to testify as to Craig's statements to him.

On the opening day of trial, defendant had moved to exclude the out-of-court statements made by victim to her mother, Detective Tabor and Dr. Gavula. Defendant did not so move with respect to Craig's out-of-court statements to Detective Tabor. Defendant also asserted no objection to Detective Tabor's direct testimony recounting Craig's statements to him; and defendant subsequently cross-examined the detective at length concerning both inconsistencies in Craig's various statements and Tabor's use of leading questions to elicit the child's responses. Finally, in his closing statement, defendant, in aid of his attack on the credibility of the State's witnesses, made frequent reference to Craig's prior out-of-court statements to the detective, for purposes of challenging the witnesses' credibility.

On appeal, defendant does not dispute the State's claim of waiver as to the admis-

---

**10.** D.R.E. 103(a) and (d) provide:
RULE 103. RULINGS ON EVIDENCE.
(a) Effect of Erroneous Ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
(1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or

(2) Offer of Proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

\* \* \* \* \* \*

(d) Plain Error. Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court.

sibility of Craig's prior out-of-court statements to Detective Tabor; and the record of waiver is clear. Defendant's decision not to object appears to have been a tactical choice reached early in the case. Defendant may not prevail on a claim of plain error when defendant has failed to articulate any basis for error under section 3507 in the admission of Craig's statements.

## B.

### Victim's Five Out-of-Court Statements to Her Mother, Dr. Gavula, and Detective Tabor And Her In Camera Testimony in Chambers

■ As noted, defendant did seek an *in limine* ruling on the eve of trial, to exclude all prior out-of-court statements of Esther, the victim, made either to her mother, Detective Tabor, or to hospital medical personnel. Defendant's sole ground for exclusion was lack of voluntariness and reliability under section 3507. The trial court, in a preliminary ruling, found victim's prior statements both to her mother *and* to Detective Tabor to be voluntary and otherwise admissible under section 3507 but deferred ruling on the admissibility of victim's prior statements through hospital personnel.

The record discloses that defendant did not thereafter ask the court to reconsider its prior rulings nor did defendant renew his objection to victim's hearsay statements as inadmissible under section 3507 for lack of voluntariness. Neither does defendant so argue on appeal. On the contrary, defendant now concedes the admissibility of victim's out-of-court statement as recounted by her mother, "Now I'm going to tell my mother how you raped me," as an excited utterance. *See* D.R.E. 803(2); *Whalen v. State,* Del.Supr., 434 A.2d 1346, 1355 (1981).

Similarly, defendant did not object to Dr. Gavula's recounting of victim's in-hospital statements to her, and instead used this testimony in later cross-examination of victim. Thus, in both direct and cross-examination, the jury was presented with Dr. Gavula's hearsay reporting of victim's statements to her: that defendant had "only stuck it in a little bit" earlier that day, after taking victim's clothes off, and her further statement that defendant had done the same thing to her about a week before.

On appeal, defendant now concedes the admissibility of victim's statements to Dr. Gavula "concerning the offense" as hearsay made in the course of medical diagnosis and treatment, D.R.E. 803(4). Defendant fails to note that the trial court so ruled in post-trial briefing of the case below. This concession disposes of any claim of plain error under section 3507 in the admission of victim's statements to hospital personnel. The record clearly supports the court's finding of defendant's having waived any objection to the admission of victim's out-of-court statements to hospital personnel. Defendant's placing in evidence before the jury of victim's *in camera* statements also bars any assertion of reversible error based on the court's *in camera* examination of victim.

The victim's out-of-court statements to Detective Tabor were the subject of the court's *in limine* "preliminary" ruling finding section 3507's requirement of voluntariness met. Four days later, the State elicited from the detective, its final witness, without any further objection from defendant, victim's two prior statements made to Tabor, her brief statement at home and her more detailed statement at the hospital. After Esther first told the detective at the home that defendant had "tried to stick his [penis] in her," Detective Tabor testified that Esther, at the hospital, told him that defendant had come into the bedroom, "pushed her down on the bed, tried to kiss on her face, removed her pants and tried to place his penis inside of her." Defendant also failed to take any exception to either of victim's hearsay statements to Detective Tabor in his post-trial motion for a new trial.

In summary, the record conclusively supports a finding of defendant's admission, either by waiver or by express consent, of: Craig's three out-of-court statements offered through Detective Tabor *and* Esther's six out-of-court statements offered through her mother, Dr. Gavula, and De-

tective Tabor as well as her in-chambers recorded testimony. Viewing the entire record, we conclude that *all* of the children's prior statements were admitted into evidence through defendant's waiver and consent and otherwise through his affirmative use of their testimony for purposes of impeachment. Thus, there is no basis in the record to sustain a finding of plain error in the trial court's asserted failure to exclude the children's prior statements, under either prong of section 3507 or under the Delaware Rules of Evidence.

### III

In support of his constitutional claim of plain error, defendant contends that the trial court's admission of the prior hearsay statements of the children denied him a fair trial in violation of his Sixth Amendment Right of Confrontation. The claim is based on his legal contention that the children's unwillingness, if not refusal, to respond to questioning on cross-examination concerning their prior statements rendered them "unavailable" for purposes of D.R.E. 804(a)(2) [11] and decisional law, state and federal, and demonstrated their incompetence and the unreliability of their prior statements. *See also* D.R.E. 801(d)(1).[12]

A claim of denial of right of confrontation usually takes one of three forms: (1) restrictions on the scope of cross-examination, either court-imposed or statutory; (2)

restrictions on the right of a defendant to physically confront his accuser; and (3) the admissibility of out-of-court hearsay statements offered as affirmative evidence against an accused. This Sixth Amendment claim is of the third category and is one on which this Court has previously spoken. *Keys v. State,* Del.Supr., 337 A.2d 18 (1975); *Johnson v. State,* Del.Supr., 338 A.2d 124 (1975); *Burke v. State,* Del.Supr., 484 A.2d 490 (1984).

 In *Keys v. State,* this Court ruled that before a declarant's prior statement qualified for admission under present section 3507, the declarant must first be called as an in-court witness and examined on direct examination by the State and thereafter be subject to cross-examination. The Court also touched on the statutory meaning of a hearsay declarant being made "subject to cross-examination," its basic relationship to the content and scope of direct examination, and the presumption that any out-of-court statement will be preceded by in-court testimony of the declarant. However, this Court explicitly recognized that consistency between in-court testimony and out-of-court statements is clearly not a prerequisite to admission of prior statements under section 3507, as subsection (a) expressly recognizes. In this case, it is clear that the State's offer of the prior out-of-court statements of victim and her brother

---

11. D.R.E. 804(a) provides:
 RULE 804. HEARSAY EXCEPTIONS; DECLARANT UNAVAILABLE.
 (a) Definition of Unavailability. Unavailability as a witness includes situations in which the declarant:
 (1) Is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement; or
 (2) Persists in refusing to testify concerning the subject matter of his statement despite an order of the court to do so; or
 (3) Testifies to a lack of memory of the subject matter of his statement; or
 (4) Is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or
 (5) Is absent from the hearing and the proponent of his statement has been unable to procure his attendance by process or other reasonable means.
 A declarant is not unavailable as a witness if his exemption, refusal, claim of lack of memo-

ry, inability or absence is due to the procurement or wrongdoing of the proponent of his statement for the purpose of preventing the witness from attending or testifying.

12. D.R.E. 801(d)(1) provides:
 RULE 801. DEFINITIONS.
 The following definitions apply under this article:
 
 \* \* \* \* \* \*
 
 (d) Statements Which Are Not Hearsay. A statement is not hearsay if:
 (1) Prior Statement By Witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, or (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive, or (C) one of identification of a person.

fully complied with the requirements of *Keys.*

In *Johnson v. State,* this Court held that a defendant's Sixth Amendment right of confrontation was not violated by the admission of a victim's out-of-court prior statement as affirmative evidence even though the victim had only limited recall of her rape and no recall of her statements describing the assailant which she had given the police. *Johnson* also answers Tucker's claim that "quality," or lack thereof, of a declarant's responses on cross-examination should render a declarant's out-of-court statements inadmissible. This Court stated:

> While the Statute does require that the out-of-court declarant be subject to cross examination, *it does not expressly require any specific quality of cross examination or key the admission of the out-of-court statement to any particular recall in court on the part of the witness.* To the contrary, the draftsmen of the Statute expressly contemplated that the in-court testimony might be inconsistent with the prior out-of-court statement. One of the problems to which the Statute is obviously directed is the turncoat witness who cannot recall events on the witness stand after having previously described them out-of-court. We conclude that there is nothing in the Statute or its intent which prohibits the admission of the statements on the basis of limited courtroom recall.

*Johnson,* 338 A.2d at 127 (emphasis added). *Johnson* may be fairly read as implicitly rejecting defendant's related claim that cross-examination which is not effective or successful with respect to a declarant's prior statement renders such statement inadmissible. As *Johnson* states, the State meets its burden of establishing the admissibility of a prior hearsay statement when the prosecution "has physically produced the declarant in court and has thus done everything in its power to give the defendant the fullest opportunity to present his best defense. The jury can make a judgment in the light of all the circumstances presented...." 338 A.2d at 128.

In *Burke v. State,* this Court enlarged on its earlier holding in *Johnson* in approving the admission of prior inculpatory statements of a witness who, due to a memory loss in a motor vehicle accident subsequent to the rape, had no recollection of having made the prior statements to the police concerning the rape. By a parity of reasoning, the inability of Esther to respond to either the State's or defendant's questioning concerning the actual rape did not infringe upon defendant's right of confrontation of victim. A rational trier of fact could conclude from the record that this was not a case of a victim or witness who "persists in refusing to testify concerning the subject matter of his statement," D.R.E. 804(a)(2). Indeed, defendant's closing summation to the trial court and to the jury conceded that. He did not argue that the child witnesses were refusing to testify, but simply that the witnesses' inability to testify and inconsistency in their testimony rendered their prior statements not credible.[13]

---

**13.** Defendant, in his closing argument, stated in part:

DEFENSE COUNSEL: We have had some inconsistencies about what was said about this rape thing. Mom said—[Jill] said—wrote it down. "Now, since you are hurting my mom, I'm telling about how you raped me." Raped. Past tense. Did happen. Now, later we have these confusing statements that are starting to come out now about "attempted to rape me."
DEFENSE COUNSEL: When [Craig] testified, he talked about—he came to Court to talk about [Esther]. He was watching Wheel of Fortune in mom's bedroom. Mommy was downstairs, but he doesn't know where. And then he said some things that, again, children—keep in mind. Think about this. These kids met with Office

Tabor and the State on at least three occasions, maybe more. There is no question about Officer Tabor's cross-examination by me. He used the questions that [Craig] said yes to, just like he said yes to everything I said.

"Did Preston take off his pants?" "Yes." "Did he take off her pants?" "Yes." "Did he do something else?" "Yes." Didn't describe everything, just would say yes to what I object to as a leading question, a question that calls for its own answer. And the kid was obviously—you have to prepare a kid to testify.

\* \* \* \* \* \*

DEFENSE COUNSEL: Something happened that night, a fight between Preston and [Jill]. And she was beaten with a stick or a club, whatever you want to call it, and a child or the

As the record demonstrates, defendant was permitted to cross-examine the victim on at least three different occasions for the purpose of probing for infirmities and inconsistencies in both her testimony and her brother's. Esther's inability to respond to defendant's questioning concerning precisely what defendant did to her, on either direct or cross-examination, is, in our view, indistinguishable from the inability of a witness to testify due to memory loss.

The clear thrust of our decisional law on the constitutional implications of the admission of prior statements of declarants as affirmative evidence is entirely consistent with United States Supreme Court rulings on the meaning of "availability" of defendants for cross-examination in a Sixth Amendment context. Indeed, our Court has closely followed the decisional law of our highest Court from *Keys* through *Burke*. In *Keys*, this Court held the receipt into evidence of out-of-court statements made by a declarant before his examination in chief violated what is now section 3507 and therefore did not require analysis on constitutional grounds. 337 A.2d at 21. In *Johnson*, this Court rejected a Sixth Amendment contention that defendant's right of cross-examination was constitutionally impinged by declarant's in-

ability to testify concerning her out-of-court statement. We premised our decision on the rationale of *United States v. Payne*, 4th Cir., 492 F.2d 449 (1974), *cert. denied*, 419 U.S. 876, 95 S.Ct. 138, 42 L.Ed.2d 115 (1974); and *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). In *Green*, Justice Harlan, in a concurring opinion, stated, "[T]he Confrontation Clause of the Sixth Amendment reaches no further than to require the prosecution to *produce* any *available* witness whose declarations it seeks to use in a criminal trial. 399 U.S. at 174, 90 S.Ct. at 1943, 26 L.Ed.2d at 506. *See Johnson*, 338 A.2d at 128;[14] *Burke*, 484 A.2d at 494-95.

The United States Supreme Court later addressed the Confrontation Clause in the context of the admissibility of a prior out-of-court statement in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). We quote from our decision in *Burke*.

Justice Harlan viewed the Confrontation Clause, *not as an absolute guarantee of the right to cross-examine, but rather as an "availability rule*, one that requires the production of a witness when he is available to testify." 399 U.S. at 182, 90 S.Ct. at 1947. He wrote: "[T]he

---

mother, depending on how you want to believe that, said something about attempted rape of the daughter. Go to the hospital. Go to the police. Go to the hospital, and we have, allegedly, the children saying yes, this happened and that happened. Then a very little while later, at the hospital, with another doctor—two doctors have it in their reports, she won't say that, won't say that. She stops. "I'm not saying anymore." Then she says, "That's not what happened. He just kissed on me. And he didn't touch me, and I didn't have to touch him."

That kid is saying, "This has gone too far. I want to tell you. This is what happened. It didn't happen like that."

\* \* \* \* \* \*

DEFENSE COUNSEL: ... [Esther], a little girl, through the State, the prosecution, asked to speak to Judge Martin all by herself? No pressure. Nobody asked her to do it. Nobody told her to do it. She sat there. Judge Martin encouraged her to try to speak and answer questions. She felt comfortable speaking to him, so she asked on her own volition. "Let me speak to Judge Martin."

And what are some of the things that she said? "Tried to take my clothes off. Tried to take his

clothes off. Didn't take his penis out. Didn't see it that day. Never saw his penis. I told mom he was trying to rape me." Then asked, "Why did you say it?" She doesn't answer. Why, then—then, "Why are you here at trial?" "To help me," she answered. And that's what the kid is trying to do, trying to get some help for this.

14. In *Johnson*, this Court stated:

We tend to agree with the view of the Fourth Circuit in *United States v. Payne*, *supra*, and with the concurring opinion of Justice Harlan in *California v. Green*, *supra*, upon which the *Payne* case relies. The prosecution has physically produced the declarant in court and has thus done everything in its power to give the defendant the fullest opportunity to present his best defense. The jury can make a judgment in the light of all the circumstances presented, including any claim by the witness denying the prior statement, or denying memory of the prior statement or operating events, or changing his report of the facts. [citations omitted] 338 A.2d at 128.

Confrontation Clause of the Sixth Amendment reaches no further than to require the prosecution to *produce* any *available* witness whose declarations it seeks to use in a criminal trial," 399 U.S. at 174, 90 S.Ct. at 1943; and continuing:

> The fact that the witness, though physically available, cannot recall either the underlying events that are the subject of an extra-judicial statement or previous testimony or recollect the circumstances under which the statement was given, does not have Sixth Amendment consequence. The prosecution has no less fulfilled its obligation simply because a witness has a lapse of memory. The witness is, in my view, available. To the extent that the witness is, in a practical sense, unavailable for cross-examination on the relevant facts, ... I think confrontation is nonetheless satisfied.

484 A.2d at 494–95 (citations omitted) (emphasis added). In *United States v. Owens, supra,* the Court made clear that only where the witness is unavailable for production by the prosecution must the prosecution demonstrate the reliability of declarant's out-of-court statement for it to be admissible. Thus, the Court held that the availability of declarant for cross-examination, notwithstanding his memory loss, dispensed with the need for any inquiry into reliability. "In that situation, as the Court recognized in *Green,* the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness's demeanor satisfy the constitutional requirements." *Owens,* 484 U.S. at ——, 108 S.Ct. at 843, 98 L.Ed.2d at 958–59 (citations omitted). Thus, *Owens* adopts the position of Justice Harlan in *Green* that "the Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" 484 U.S. at ——, 108 S.Ct. at 842, 98 L.Ed.2d at 957, *quoting Kentucky v. Stincer,* 482 U.S. 730, 739, 107 S.Ct. 2658, 2664, 96 L.Ed.2d 631, 643 (1987).

In disregard of these authorities, state and federal, defendant argues that victim's silence on the witness stand was tanta-

mount to her unavailability to testify within the meaning of D.R.E. 804(a)(2). Defendant then suggests that this definition of the converse of unavailability should be found to override, as a matter of constitutional law, section 3507's definition of availability. A similar argument was made and rejected in *United States v. Owens, supra.* In *Owens,* the Court evaluated an internal inconsistency in the Federal Rules of Evidence where "the forgetful witness who is deemed 'subject to cross-examination' under 801(d)(1)(C) is simultaneously deemed 'unavailable' under 804(a)(3)." 484 U.S. at ——, 108 S.Ct. at 844, 98 L.Ed.2d at 960. The Court found that "this [was] not a substantive inconsistency, but only a semantic oddity resulting from the fact that D.R.E. 804(a) has for convenience of reference in D.R.E. 804(b) chosen to describe the circumstances necessary in order to admit certain categories of hearsay testimony under the rubric 'Unavailability as a witness.'" 484 U.S. at ——, 108 S.Ct. at 844, 98 L.Ed.2d at 960. The Court characterized the formulation of 804(a) as a mere "verbal curiosity" in that "the two characterizations [under 801(d)(1)(C) and 804(a)(3) ] are made for two entirely different purposes and there is no requirement or expectation that they should coincide." 484 U.S. at ——, 108 S.Ct. at 845, 98 L.Ed.2d at 961. Extending that rationale to the Delaware Rules of Evidence, the definitions of unavailability in Rule 804(a) describe only the circumstances necessary to admit hearsay under Rule 804(b). The definitions of unavailability in Rule 804(a) cannot override the definition in section 3507 of presence without conflicting with the consistent teachings of our decisional law in *Johnson* and *Burke* and the federal authorities which they complement.

Applying the foregoing principles in this case to the prior out-of-court statements of the victim to her mother and the police detective, the record establishes:

(1) The victim was produced by the State, questioned on direct examination and made available to the defense for cross-examination. Therefore, the victim was available for cross-examination and her out-of-

court statements do not require examination for "indicia of reliability," as defendant contends. Nevertheless, as the trial court noted, and defendant concedes, victim's statements had a trustworthiness similar to matters admissible under *res gestae* or D.R.E. 803(4). *See* n. 4 *infra.* Therefore, there was adequate "indicia of reliability" for the jury to evaluate the truth of declarant's prior statements.

(2) In addition, the victim was recalled to the witness stand at least twice and defense counsel was given a full and unimpeded opportunity to cross-examine victim. This gave the jury a full opportunity to observe her demeanor and to evaluate the strength and weakness of her testimony. Defendant was also accorded the same full opportunity to cross-examine victim's brother.

The federal decisional authorities relied upon by defendant are inapposite. They generally involve confrontation claims based on restrictions on the scope of cross-examination or the admission of out-of-court statements of a declarant who is physically unavailable for cross-examination. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Ellison v. Sachs,* D.Md., 583 F.Supp. 1241 (1984). Had victim not been physically available for cross-examination, her prior out-of-court statements would have been inadmissible as a matter of law under section 3507(a). *Coy v. Iowa,* —— U.S. ——, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), is equally inapposite since it cannot be contended that the court denied defendant his right to a face-to-face confrontation with defendant during his cross-examination of victim. *See* I–A *infra.*

In conclusion, we hold that under the facts and circumstances of this case, the admission of the victim's prior out-of-court statements to her mother and to the police detective, as well as those of her brother, was not only proper under 11 *Del.C.* § 3507, but also not violative of defen-

dant's Sixth Amendment rights, notwithstanding the children's unwillingness or inability to fully respond, particularly with respect to the issue of sexual penetration.

**IV**

We address defendant's remaining claim of plain error by the trial court in admitting evidence of prior sexual contact between defendant and victim and that victim had contracted a venereal disease. Defendant argues that if the victim's out-of-court statements concerning prior sexual contact included in victim's medical records were inadmissible under D.R.E. 804(b) and redacted, Superior Court's ruling *allowing* the State, in summation, to refer to Dr. Gavula's testimony concerning victim's prior sexual act was plain error. The fallacy of defendant's argument is that any inconsistency in the court's ruling is wholly attributable to defendant's trial strategy.

As first noted above (see section I–A *infra* ), defendant did, at the beginning of trial, assert an objection to the State's introduction of evidence of prior sexual contact between victim and defendant that did not meet the "plain, clear and conclusive" requirements of D.R.E. 404(b) as interpreted in *Diaz v. State.* 508 A.2d at 865. The court instructed the State not to refer to "prior acts" testimony in its opening argument, but otherwise reserved decision on the issue until ripe for determination. The record discloses that the court was well aware of the then controlling Delaware decisional law applying D.R.E. 404(b), that is, both *Diaz* and *Renzi v. State,* Del.Supr., 320 A.2d 711, 712 (1974).

The court was not thereafter asked to render any ruling on "other crimes" evidence until all the evidence was in. Defendant then moved, *one,* to excise from the hospital record previously admitted (with his express consent) the two entries referring to victim's prior sexual contact by defendant; and *two,* that the jury be instructed to disregard Dr. Gavula's testimony recounting victim's responses to the physician's questioning about prior sexual contact, and with whom. *See* II–B *infra.* The court agreed to redact the "other

crimes" statements from the hospital record as not meeting the *Diaz/Renzi* test. However, the court concluded, properly in our view, that victim's out-of-court statements admitted through Dr. Gavula were already before the jury; that defendant had not asserted any timely objection to Dr. Gavula's testimony; and that the victim's testimony was otherwise admissible under D.R.E. 803(4). *See infra* I–B, nn. 5, 6, 7 and 8.

The State argues that defendant's waiver of any objection to Dr. Gavula's testimony concerning prior sexual contact and her finding of a venereal disease was a deliberate tactical maneuver to support an argument that the child's physical symptoms may have been the result of venereal disease contracted from someone other than defendant, rather than from sexual intercourse with defendant. The record permits such inference from defendant's extensive cross-examination of Dr. Gavula concerning the disease of chlamydia and his attack in summation on victim's motives. n. 13, *infra.* The record also fully supports the court's finding of waiver. Defendant also fails to reconcile his position upon his plain error claim with his concession on appeal of the admissibility of Dr. Gavula's testimony under D.R.E. 803(4). Defendant further fails to explain how a claim of plain error may be found in an evidentiary ruling that the trial court addressed before summation and which defendant ignores.

We turn to the facial inconsistency of the court's rulings. The conundrum presented is that if the trial court had excluded the victim's statements of prior sexual contact by defendant, after their previous admission, the jury could have drawn an unfavorable inference concerning victim. That inference would not have been alleged by the court's excluding the evidence of victim's venereal disease and which would, in turn, have precluded defendant from relying on that issue as a defense. We conclude that plain error may not be found in an inconsistency in the court's rulings for which the court was not responsible. The admission of evidence rests in the sound discretion of the trial judge and will not be disturbed on appeal unless the admission over objection was a clear abuse of discretion. *Howard v. State*, Del.Supr., 549 A.2d 692, 693 (1988). Under the then controlling law of *Renzi* and *Diaz*, admission of the testimonial evidence of victim's having a venereal disease and of prior bad acts of defendant was clearly not plain error depriving defendant of a fair trial.

\* \* \*

Affirmed.